William W. KILGARLIN et al., Plaintiffs,

v.

Crawford MARTIN, Secretary of State of the State of Texas, et al., Defendants.

Civ. A. No. 63-H-390.

United States District Court
S. D. Texas,
Houston Division.

Feb. 2, 1966.

Tony Korioth, Houston, Tex., for plaintiffs.

Charles F. Mitchell, Asst. County Atty. of Harris County, Texas, Houston, Tex., for defendants, William M. Elliott and Robert E. Turrentine, Jr.

Frank Erwin, Jr., Austin, Tex., Chairman of State Democratic Executive Committee.

Waggoner Carr, Atty. Gen. of Texas, Austin, Tex., for all State officials.

Dorsey B. Hardeman, San Angelo, Tex., for intervenors Dorsey B. Hardeman, George Moffett, Louis Crump, Ralph M. Hall, J. P. Work, Grady Hazlewood, Galloway Calhoun, Jr., Tom Creighton, Frank Owen, III, and H. J. Blanchard.

R. Dean Moorhead, Austin, Tex., for intervenors Myra Banfield, Ben Barnes, John E. Blaine, Jack Crain, David Crews,

Wayne Gibbens, Forrest A. Harding, George T. Hinson, James L. Slider and Bill Walker.

J. R. Owen, County Atty., Williamson County, Georgetown, Tex., for defendants Sam V. Stone and Dick Cervenka.

Paul H. Dionne, County Atty. of Pecos County, Fort Stockton, Tex., for defendants Walter L. Guenger and Billy Hodges.

R. L. (Bob) Lattimore, Crim. Dist. Atty., and Allyn Zollicoffer, Civil Administrative Asst., Crim. Dist. Atty., Edinburg, Tex., for defendants Milton D. Richardson and Julio Guzman.

Jack H. Holland, County Atty., Henderson County, Athens, Tex., for defendants R. H. Lee and Mrs. Anna Bennet.

Naomi Harney, County Atty., Potter County, Amarillo, Tex., for defendants, W. M. Adams and Mrs. Ann Lyle.

Joseph C. Ternus, County Atty., San Patricio County, Sinton, Tex., for defendants William A. Schmidt and Velma Sherman.

H. C. Davidson, Houston, Tex., for intervenors, Guthrie Taylor, James S. Miles, John Wells and Job. O. Booth, Jr.

Patrick B. Gibbons, III, Dallas, Tex., for defendant Peter O'Donnell, Jr., Chairman of the State Republican Executive Committee.

Before BROWN, Circuit Judge, and INGRAHAM and NOEL, District Judges.

NOEL, District Judge:

*Preface*

■ Plaintiffs ask this Court to abolish House Bill 195, Acts of the 59th Legislature, Regular Session, 1965, c. 351, which reapportions [1] the House of

Representatives of the State of Texas. Having won the first round in this Court but lost the second round in the Texas Legislature, plaintiffs return here for the third round of a now-typical reapportionment struggle.

The issue now is not whether, but how, to reapportion Texas for the election of its House of Representatives. Plaintiffs vigorously urge that all members of the House should, indeed must, be elected from single-member districts. Plaintiffs press upon the Court their own single-member district reapportionment plan.[2] Plaintiffs first offered their plan to the Texas Legislature in 1965. It was rejected. Instead, the Legislature adopted House Bill 195 which embraces a combination plan of single-member, multi-member, and flotorial districts.

Plaintiffs attack the plan of House Bill 195 on various constitutional grounds. But their ultimate thrust is for judicial sanctions which would substitute plaintiffs' plan of single-member districts, only, for the Legislature's combination plan of House Bill 195.

■ The Court holds that House Bill 195 does not violate the federal Constitution, except as it causes dilution of voting strength in the eleven flotorial districts. The Court declares the Bill federally unconstitutional as to the flotorial districts solely because it dilutes the voting rights of those citizens living in such districts who are permitted to vote for only one legislator. But the Court expressly rejects plaintiffs' contentions that the combination plan of House Bill 195 constitutes an unlawful scheme to minimize the voting strength of or to disenfranchise certain racial and political elements.

1. "Apportionment," in the technical sense, refers solely to the process of allocating legislators among several areas or political subdivisions, while "districting" entails the actual drafting of district lines. Thus, Congress "apportions" Representatives among the states, while the states "district" by actually drawing the congressional district lines. In Texas, the Legislature both "apportions" and "districts" as in H.B. 195. For example,

it "apportions" 19 Representatives to Harris County, and "districts" Harris County into three districts. In keeping with common usage, however, the total process will be referred to as "apportionment" in this opinion. See Comment, 72 Yale L.J. 968 (1963) at 970 n. 24.

2. This plan is discussed at length under the section of plaintiffs' Supplemental Brief entitled "The Best Plan Rule." See note 31 infra.

■ The Court declines to substitute its judgment for that of the Texas Legislature as to the preferable composition and configuration of legislative districts, The injunctive relief prayed for is denied. The Court recommits to the Legislature for accomplishment by August 1, 1967 the job of equalizing the votes of citizens living in the flotorial districts, failing which all Representatives from such districts will be elected at large as in multi-member districts.

### The Prior and Present Proceedings

The present proceedings are in continuation of the suit instituted July 15, 1963 by some of the plaintiffs. In the first round, plaintiffs attacked the state legislative apportionment statutes [3] then in effect for Senators as well as Representatives. By summary judgment entered January 11, 1965, the Court declared in Article 3, §§ 25 and 26a of the Texas Constitution [4], Vernon's Ann.St., and the apportionment statutes enacted thereunder to be violative of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

The Court declined to grant plaintiffs' requests for injunctive relief and an oral hearing. The Court retained jurisdiction and provided that in the event the Legislature had not enacted a constitutionally valid legislative apportionment scheme by August 2, 1965, plaintiffs might petition the Court for further relief. Plaintiffs have returned for that purpose.

The positions of all present parties as well as amicus curiae are set forth in Appendix "A."

At the invitation of the Court, counsel attended the pretrial conference held on July 28, 1965 in the companion case involving congressional reapportionment.[5] With the benefit of the Court's views there expressed, counsel prepared a pretrial order in this case, which the Court approved on September 9, 1965.

The pretrial order specifies the issues for decision as:

(1) Whether or not the population disparity between state legislative districts, created by House Bill 195, is invidiously discriminatory, and deprives certain citizens and voters, because of their place of residence within the State, the equal protection of the laws, in violation of the Fourteenth Amendment to the United States Constitution, so as to render House Bill 195 unconstitutional.

(2) Whether or not the particular use of multi-member and flotorial districts created by House Bill 195 constitutes a scheme of representation which has the effect of minimizing or cancelling out the voting strength of racial and political elements within said districts; and if so, does it deny to those racial and political elements, equal protection of the law, in violation of the Fourteenth Amendment to the United States Constitution so as to render House Bill 195 unconstitutional.

---

3. Tex.Rev.Civ.Stat.Ann. Art. 193 (Supp. 1964); and Tex.Rev.Civ.Stat.Ann. Art. 195 (Supp.1964).

4. "Sec. 25. The State shall be divided into Senatorial Districts of contiguous territory according to the number of qualified electors, as nearly as may be, and each district shall be entitled to elect one Senator; and no single county shall be entitled to more than one Senator."

"Sec. 26a. Provided however, that no county shall be entitled to or have under any apportionment more than seven (7) Representatives unless the population of such county shall exceed seven hundred

thousand (700,000) people as ascertained by the most recent United States Census, in which event such county shall be entitled to one additional Representative for each one hundred thousand (100,000) population in excess of seven hundred thousand (700,000) population as shown by the latest United States Census; nor shall any district be created which would permit any county to have more than seven (7) Representatives except under the conditions set forth above. * * *"

5. Bush v. Martin, Civil No. 63–H–266, S.D. Tex. Jan. 5, 1965, 251 F.Supp. 484.

(3) Whether or not the particular use of multi-member districts created by House Bill 195 denies to negro citizens their right to vote as guaranteed under the Fifteenth Amendment to the United States Constitution, so as to render House Bill 195 unconstitutional.

(4) Whether or not the particular mixture of multi-member, flotorial and single-member districts created by House Bill 195 is an arbitrary and capricious "crazy-quilt" manner of apportionment lacking any rationale, so as to render House Bill 195 unconstitutional under the Fourteenth Amendment to the United States Constitution.

An evidentiary hearing was held on October 14, 1965. The evidence presented consisted of stipulations, depositions, maps, charts, statistical tables, certified copies of the election statutes from numerous states, and election returns. No witnesses testified in person. Counsel orally summarized the essential testimony contained in the various depositions. Trial briefs were received and extended oral arguments were heard.

Shortly after the hearing, the Court through its Clerk invited counsel to submit additional briefs and written arguments regarding possible remedies in the event the Court should find any of the eleven flotorial districts created in H.B. 195 to be in violation of the Equal Protection Clause, and therefore invalid. In response to this invitation, counsel for plaintiffs filed their Supplemental Brief on November 24, 1965, directed to "new considerations, substantive as well as remedial." The Attorney General of Texas replied to this new brief on December 16, 1965. The case is now ripe for decision.

The expansion of plaintiffs' Supplemental Brief to cover the new issue was undoubtedly occasioned by an objection to plaintiffs' evidence made by defendants, and questions asked by the Court at the oral hearing. The issue will be deemed to have been incorporated in the pretrial order as follows: [6]

(5) Whether or not, once it is shown that the Legislature could have devised an apportionment scheme with a substantially lessened range of deviation from the ideal, and within the same system established by State policy, the scheme is presumptively invalid and the burden of proof shifts to the proponents thereof.

For simplicity of reference, the Court will refer to these issues as: (1) population disparity, (2) gerrymandering (which is divided into political and racial), (3) Negro disenfranchisement, (4) "crazy-quilt" apportionment, and (5) burden of proof. Also, for simplicity and a degree of brevity, much important material, including elaboration of the Court's views, has been placed in the notes.

■ The Court has jurisdiction pursuant to 28 U.S.C.A. Sections 2281 and 2284, and retains continuing jurisdiction of the subject matter under 28 U.S.C.A. Section 1343(3). The classes specified are properly before the Court and the parties plaintiff, as well as those aligned as plaintiffs, have standing to sue.

Because of its basic import and critical effect on plaintiffs' case as now postured, involving what they characterize as "a virgin and ill-defined area of the law," we first turn to the basic principles involved in Issue 5.

### Burden of Proof

Plaintiffs' contentions will be taken verbatim from their Supplemental Brief. At the outset, they outline in three steps their conception of "the proper basis for the judicial review of legislative reapportionments in terms of federal constitutional standards," and immediately thereafter furnish their guide for placing the burden of proof, and erection of

6. The Court regards the issue as one arising under Fed.R.Civ.P. 15(b).

the new beacon.[7] Plaintiffs' full contention is then summarized at the end of their argument, as follows:

"In summary, Plaintiffs submit that once it is shown that the Legislature could have devised an apportionment scheme with a substantially lessened range of deviation from the ideal, and within the same system established by State policy, that the scheme is presumptively invalid and the burden of proof shifts to the proponents thereof. Once again, the Defendants have wholly failed in their burden of proof."

In short, plaintiffs argue that it is the burden of defendants to legitimize and justify apportionment departures from a strict population standard unless *de minimis*, but they do not set out the limits of *de minimis*. In response, defendants argue that "The basic difference between the parties on this issue comes down to a disagreement as to the point at which a presumption of invidiousness arises." Defendants contend that variations in H.B. 195 ranging from 15% above average to 15% below average are within the limits of the Legislature's

unreviewable discretion, or in plaintiffs' terminology, the Legislature has a 30% range of deviation which is *de minimis*, and that " * * * the presumption [of invidiousness] does not arise if the deviation is less than 15%."

These arguments will be treated later, but here we shall deal with the basic principles involved and plaintiffs' theory "that once plaintiffs show that the Legislature could have devised an apportionment scheme with a lessened range of deviation from the ideal, and within the same system established by State policy, that the scheme is presumptively invalid and the burden of proof shifts to the proponents thereof."

The issue of the burden of proof has not been squarely raised in any of the recently decided reapportionment cases, undoubtedly because the disparities involved were invidious *per se*. But henceforth, the questions for decision will likely be more refined. We are here assaying the constitutionality of a statute passed for the express purpose of complying with the requirements of the Equal Protection Clause. We should decide this important question which in-

---

7. *Excerpt from Plaintiffs' Supplemental Brief, pages 8, 9:*

"1. Does the apportionment scheme under review effect a deviation from the norm of equal popular representation and work a dilution of relative individual voting power?

(The necessary corollary to this inquiry would be whether the deviation were considered *de minimis*, in which case the departure would be insufficient to invoke constitutional review.)

"2. If the first inquiry is answered in the affirmative, is the departure so substantial or 'major' as to constitute per se an invidious discrimination?

(In this regard, certain courts and commentators have suggested that departures in excess of the fifteen percent range from the norm are per se discriminations and unconstitutional.)

"3. If the departure is not invidiously discriminatory per se, is it supported by a rational and constitutionally permissible state policy?

(For instance, if a deviation of twelve percent from the norm were necessary in order to district in accordance with county boundaries, the deviation is jus-

tified; on the other hand, if the deviation is a discriminatory design, it is not, and the act must fall.)

*"Burden of Proof: The Legitimation of Deviation*

The point of departure in analysis of the reapportionment decisions in terms of the intended basis of review of apportionment deviation and the placing of the burden of proof relative to such concern is found in the *Reynolds* opinion, at 377 U.S. [533] 579 [84 S.Ct. 1362, 1391, 12 L.Ed.2d 506]:

*So long as* the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy *some deviations* from the equal-population principle are constitutionally permissible * * *. (emphasis supplied)

The key words in the quoted text are the first three, '*So long as*.' These words of limitation make it clear that the burden of proof rests with the defenders of the apportionment scheme under attack to show that the divergences in question are based on (i) legitimate considerations (i.e., constitutionally permissible ones), and (ii) rational state policy."

volves evidence, procedure, and statutory construction.

■ In neither Reynolds, supra, nor Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964), important recent authority, did the Court have before it this question. Hearing and decision of reapportionment lawsuits are governed by the time-honored rules of constitutional law, procedure, and statutory construction. *Reapportionment suits in this respect are not sui generis.* Therefore, these rules will be reviewed.

■ The party assailing the constitutionality of a statute has a heavy burden of persuasion, the more so because it may prove very tedious. The phrase "presumption of constitutionality" is frequently used with regard to challenged statutes, sometimes as an ordinary presumption in the evidentiary sense.[8] While embodying the notion that the challenging party has the initial burden of going forward with evidence, the presumption relates more accurately to the burden of persuasion. Affirmatively stated, it is the burden of persuasion of the party alleging the unconstitutionality of a statute to negate the existence of any state of facts which would sustain the constitutionality of the legislation. Madden v. Com. of Kentucky, 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940). The United States Supreme Court has held in a long, unbroken line of decisions[9] that under the Equal Protection Clause of the Fourteenth Amendment, the party charging unconstitutionality of a state statute must demonstrate that the classification of the statute rests upon grounds which admit of but one conclusion "beyond a rational doubt"-[10] that the grounds are arbitrary or unreasonably discriminatory. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911).[11]

---

8. "A presumption * * * is in its characteristic feature a rule of law laid down by the judge, and attaching to one evidentiary fact certain *procedural consequences* as to the duty of production of other evidence by the opponent * * *. [I]t must be kept in mind that the peculiar effect of a presumption 'of law' (that is, the real presumption) is merely to invoke a rule of law compelling the jury to reach the conclusion *in the absence of evidence to the contrary* from the opponent." 9 Wigmore, Evidence § 2491 (3d ed. 1940).

9. E. g.,
McGowan v. State of Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). (Plaintiff must prove exceptions in Sunday closing laws have no reasonable basis.)
Madden v. Com. of Kentucky, 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940). (Plaintiffs must prove statute which taxed out-of-state bank at higher rate than within-state banks was "hostile and oppressive discrimination.)
Metropolitan Cas. Ins. Co. of New York v. Brownell, 294 U.S. 580, 55 S.Ct. 538, 79 L.Ed. 1070 (1935). (Foreign corporation must prove state arbitrarily discriminates against it when compared to domestic corporations subject to its regulation.)
Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369

(1911). (Plaintiffs must prove statute which permitted pumping water from wells not penetrating rock, and prohibited wells penetrating, was arbitrary in distinction.)
Erb v. Morasch, 177 U.S. 584, 20 S.Ct. 819, 44 L.Ed. 897 (1899). (Plaintiff does not prove denial of equal protection because statute on its face regulates railroads in same town differently, but must prove difference is arbitrary.)
State of Missouri v. Lewis, 101 U.S. 22, 25 L.Ed. 989 (1879). (Plaintiff must prove use by state of different methods of judicial appeal in different parts of state is unreasonable.)

10. F.H.A. v. Darlington, Inc., 358 U.S. 84, 91, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958).

11. "The rules by which this contention must be tested, as is shown by repeated decisions of this court, are these: 1. The equal-protection clause of the 14th Amendment does not take from the state *the power to classify in the adoption of* police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality. 3. When the classi-

In summary, the key language of the Supreme Court which furnishes guidance for a lower court in reviewing a state apportionment statute, bare of context, is the following:

" * * * [A]n individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a *substantial fashion* diluted when compared with votes of citizens living in other parts of the State." Reynolds v. Sims, 377 U.S. at 568, 84 S.Ct. at 1385. (Emphasis added.)

"So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature." Reynolds v. Sims, 377 U.S. at 579, 84 S.Ct. at 1391.

" * * * [T]he proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination." Roman v. Sincock, 377 U.S. at 710, 84 S.Ct. at 1548.

"We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement." Reynolds v. Sims, 377 U.S. at 577, 84 S.Ct. at 1390 (footnote omitted).

■ The Court interprets the foregoing language of the Supreme Court, when read in context with the opinions from which it is taken and the applicable basic principles, as providing the guidelines for placing the burden of proof in this or any other state legislative reapportionment case, as follows:

(1) One who attacks the federal constitutionality of a state apportionment statute must prove that the weight of an individual's vote for state legislators, when compared with votes of citizens living in other parts of the State, has been diluted in a substantial fashion.

■ (2) The attacking party, such as plaintiffs, would clearly prove a substantial dilution if the deviations were shown to be of such magnitude that no policy could justify them, which is a concept of invidiousness *per se.*

■ (3) If the attacking party, such as plaintiffs, cannot or does not prove invidiousness *per se,* then he must prove that the divergences from a strict population standard are not based on any legitimate consideration incident to the effectuation of a rational state policy.

■ (4) The person so attacking, such as plaintiffs, in order to prove minor deviations impermissible would do so by proving that such deviations were arbitrary and therefore discriminatory because based upon factors

fication in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. * * *" 220 U.S. at 78–79, 31 S.Ct. at 340.

which could not be justified on any rational ground.[12]

■ Plaintiffs' contention that *any* population deviation above a *de minimis* figure from exact population equality raises a presumption of unconstitutionality, lacks Supreme Court authority. The language quoted from page 579 of *Reynolds,* 84 S.Ct. page 1391, upon which they rely, does not support their assertion of its dictate.

In the context of the legislative reapportionment cases, the United States Supreme Court has struck down statutes in which the ratio of the population in the largest district to the population in the smallest district was 12.7 to 1,[13] 12 to 1,[14] 6 to 1,[15] 4.7 to 1,[16] and 4.36 to 1.[17] Additionally, the Court in Reynolds v. Sims stated in dicta that

> "* * * [I]f a State should provide that the votes of citizens in one part of the State should be given two times * * * the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted." 377 U.S. at 562, 84 S.Ct. at 1382.

Such language could be read to indicate that any reapportionment scheme containing a district which gives the weight of the vote in that district twice the

weight, or more, of the weight of the vote in the smallest district in the state would be constitutionally defective, in fact; that is, invidious *per se.*

■ However, the final opinion in the reapportionment group decided by the same Court on the same day as Reynolds must be considered. It helps in refining the teaching of Reynolds. In Lucas v. Forty-Fourth General Assembly of State of Colorado, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964), the challenged plan of apportionment contained a ratio of deviation in the State House of Representatives between the largest district and the smallest district of 1.7 to 1. 377 U.S. at 727, 84 S.Ct. at 1469. The Court observed at two places in that opinion that the House of Representatives was at least *arguably apportioned substantially on a population basis.*[18] Although the Court does not hold that the 1.7 to 1 ratio standing alone, without consideration of other factors, would represent apportionment substantially on a population basis, it does furnish a valuable insight into the thinking of the Court. This language clearly implies, even if it does not decide, the invidiousness *per se* does not arise by a mere showing of a ratio of 1.7:1.

If the deviation, divergence or disparity, the label used being of no significance, does not come within the *per se* classification of *Reynolds; Davis;*

---

12. "Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." Madden v. Com. of Kentucky, 309 U.S. 83, 88, 60 S.Ct. 406, 408, 84 L.Ed. 590 (1940). (Footnotes omitted.)

13. WMCA, Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568 (1964).

14. Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964).

15. Maryland Comm. for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964).

16. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

17. Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964).

18. "* * * [O]ne house of the Colorado Legislature is at least arguably apportioned substantially on a population basis * * *," 377 U.S. at 730, 84 S.Ct. at 1470; "* * * [T]he Colorado House of Representatives is arguably apportioned on a population basis * * *." 377 U.S. at 739 n. 32, 84 S.Ct. at 1475.

*WMCA, Inc.; Roman;* or *Maryland Comm.;* but yet it is not *de minimis,* then it would come within the constitutionally permissible concept of *Lucas,* the usual presumptions operating in favor of sustaining the statute.

If the reviewing court determines that the ratio of deviation in a state apportionment statute is not *de minimis,* but on the other hand it determines that such deviation does not cause invidiousness *per se,* then the presumption of its constitutionality will be the postulate of adjudication. People of State of New York v. O'Neill, 359 U.S. 1, 79 S.Ct. 564, 3 L.Ed.2d 585 (1959).

> "It is * * * a maxim of constitutional law that a legislature is presumed to have acted within constitutional limits, upon ·full knowledge of the facts, and with the purpose of promoting the interests of the people as a whole, and courts will not lightly hold that an act duly passed by the legislature was one in the enactment of which it has transcended its power." Atchison, T. & S. F. R. Co. v. Matthews, 174 U.S. 96, 104, 19 S.Ct. 609, 43 L.Ed. 909 (1899).

In addition to the presumption of validity, the presumption of reasonableness is with the statute, Salsburg v. State of Maryland, 346 U.S. 545, 74 S.Ct. 280, 98 L.Ed. 281 (1954) ; and this presumption continues until the contrary is "shown beyond a rational doubt," F. H. A. v. Darlington, Inc., 358 U.S. 84, 91, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958), despite the fact that in practice the law in question may result in some inequality. McGowan v. State of Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). Some inequality is permissible in the area of reapportionment. Reynolds v. Sims, 377 U.S. at 578, 84 S.Ct. at 1390.

> "To be able to find fault with a law is not to demonstrate its invalidity. * * * The problems of government are practical ones and may justify, if they do not require, rough accommodations,—illogical, it may be,

and unscientific. * * * Mere errors of government are not subject to our judicial review. It is only its palpably arbitrary exercises which can be declared void under the 14 Amendment * * *." Metropolis Theater Co. v. City of Chicago, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913).

Indeed, in this area of permissible deviation, the presumption of invidiousness for which plaintiffs contend does not exist.

> "On the contrary, it is to be presumed that the state in enforcing its local policies will conform its requirements to the Federal guarantees. Doubts on this point are to be resolved in favor of, and not against, the state." Corporation Comm. of Okla. v. Lowe, 281 U.S. 431, 438, 50 S.Ct. 397, 399, 74 L.Ed. 945 (1930).

A federal court does not sit in a reapportionment case as a superlegislature. The presumption of constitutionality with which a statute comes before a court for review bars the Court from lightly choosing that reading of the statute which will invalidate it, over that which will save it. Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).

Defendants are not here in a position of having to justify the constitutionality of H.B. 195, but instead plaintiffs must demonstrate that defendants cannot explain its provisions on any rational ground. As the Supreme Court has said:

> "It is a salutary principle of judicial decision, long emphasized and followed by this Court, that the burden of establishing the unconstitutionality of a statute rests on him who assails it, and that courts may not declare a legislative discrimination invalid unless, viewed in the light of facts made known or generally assumed, it is of such a character as to preclude the assumption that the classification rests upon some rational basis within the knowledge and experience of the legis-

lators. A statutory discrimination will not be set aside as the denial of equal protection of the laws if any state of facts reasonably may be conceived to justify it." Metropolitan Cas. Ins. Co. of New York v. Brownell, 294 U.S. 580, 584, 55 S.Ct. 538, 540, 79 L.Ed. 1070 (1935). (Footnote omitted.)

To prevail, plaintiffs must show that no reasonable explanation for the population deviations exists which will sustain the constitutionality of H.B. 195.

 Procedurally, the case moves as follows: (1) because of the presumption of the constitutionality of H.B. 195, plaintiffs have the initial *burden of going forward with evidence* to demonstrate an existing population disparity between districts; (2) if no *per se* invidiousness exists, then plaintiffs have the *burden of persuasion* in negating the existence of any reasonable, and therefore not arbitrary consideration which would justify the existence of minor population disparities, because this fact is essential to their case; and (3) if there are conflicting inferences to be drawn from the evidence offered by plaintiffs or defendants or both, the fact-finder has the responsibility to choose among the disputed inferences. A court is not compelled to draw an inference of unconstitutionality if there is evidence that the inference of constitutionality is "equally, or more, persuasive." Wright v. Rockefeller, 376 U.S. 52, 57, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964).

 In summary, the answer to the question posed in Issue 5 is that the law does not recognize a presumption of unconstitutionality of a state statute as measured by the Equal Protection Clause. The presumption is always in favor of the constitutionality of the statute, albeit the reviewing court after considering all of the evidence may determine that the attacking party has proved such invalidity. Neither the burden of proof which we find to be the burden of persuasion, nor the burden of going forward with the evidence, shifts to the defendants when the reapportionment review involves an alleged deviation which exceeds *de minimis* but which is less than what the Court finds to be invidious *per se*, upon it being shown by the plaintiffs that the Legislature could have devised an apportionment scheme with a lessened range of deviation from the ideal within the same system established by State policy.

With this preliminary, but nonetheless important subsidiary question settled, we shall proceed to consideration of the case upon the merits.

### Population Disparity

Proceeding now to the four issues delineated in the pretrial order, the first to be determined concerns population disparity between districts and whether because of their place of residence certain citizens suffer dilution of their votes in violation of the Equal Protection Clause. This question will be treated first as to flotorial districts, and second as to districts other than flotorial.

### A. *Flotorial Districts*

The Constitution of the State of Texas authorizes the use of flotorial districts.[19] Historically, their use in Texas dates from 1848, and it has been continuous since 1875.[20] Provision for them in House

---

19. Provision for flotorial districts is contained in Art. 3, Sec. 26 of the Texas Constitution. As used in Texas, a flotorial district is a voting district entitled to one Representative, but is composed of more than one county, one of which has additional representation in another district. As an example, in H.B. 195 Smith County and Rusk County receive one Representative as District 15F, while Smith County alone receives another Representative as District 14. By contrast, a multi-member district consists of one county only, and elects more than one Representative from that district. The United States Supreme Court utilized the spelling "floterial" in Davis v. Mann, 377 U.S. at 686, 84 S.Ct. at 1445.

20. Defendants have compiled the history of the constitutional and statutory provisions for the apportionment of Texas as their

Bill 195 is neither novel nor experimental, but instead is a continuation of a long-established State practice. But although there is a genuine historical basis for their use, should any invidious discrimination result from their use under House Bill 195, it must cease.

"* * * [N]either history alone, nor * * * other sorts of interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history * * *, cast votes." Reynolds v. Sims, 377 U.S. at 579–580, 84 S.Ct. at 1391. (Footnote omitted.)

The evil is not inherent in this type of district, but in the discrimination resulting from use in the particular manner of H.B. 195.

The Supreme Court of the United States has indicated that the use of flotorial districts may be permissible in the apportionment of one of the houses of a bicameral state legislature, in Reynolds:

"Single-member districts may be the rule in one State, while another State might desire to achieve some flexibility by creating multimember or floterial districts." 377 U.S. at 579, 84 S.Ct. at 1390 (Footnotes omitted.)

 The critical definition of a flotorial district, as understood by the Supreme Court, appears in a footnote in Davis v. Mann, 377 U.S. 678, at 686 n. 2, 84 S.Ct. 1441, at 1445 (1964): "The term 'floterial district' is used to refer to a legislative district which includes within its boundaries several separate districts or political subdivisions which independently would not be entitled to *additional representation* but whose conglomerate population entitles the entire area to another seat in the particular legislative body being apportioned." (Emphasis added.) Bearing in mind that the Court speaks in terms of *additional* representation, the flotorial district must satisfy the clear command of *Reynolds* that holds: "Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." 377 U.S. at 579, 84 S.Ct. at 1390.

The Supreme Court used the example of Lynchburg, Virginia, to illustrate its concept of a flotorial district in *Davis,* 377 U.S. at 686 n. 2, 84 S.Ct. at 1445. This example has the value of an illustration only. It cannot be considered an example of a valid flotorial district because the Court in that opinion held the statute which created the district to be unconstitutional. In the final analysis, the sole authoritative guideline from the Supreme Court is that of *Reynolds* which applies to all voting, irrespective of the kind of district in which it is done,—it is that the vote of any citizen must be approximately equal in weight to that of any other citizen in the state.

 Plaintiffs allege that these flotorial districts effect such an extreme dilution of the votes of the residents of certain counties that these districts are unconstitutional *per se* under *Reynolds.* Inasmuch as there are deviations from

---

Exhibit No. 1. The legislation which utilizes flotorial districts is as follows:

(1) Ch. 162, § 3, 3 Gammel, Laws of Texas 311 (1848).

(2) Ch. 44, § 3, 3 Gammel 478 (1850), as amended by Ch. 151, 3 Gammel 622.

(3) Ch. 4, § 3, 3 Gammel 1289 (1853).

(4) Ch. 45, § 3, 4 Gammel 1402 (1860).

(5) Ordinances, § 2, 8 Gammel 753 (1875).

(6) Ch. 13, Art. 13, 9 Gammel 269 (1882).

(7) Ch. 21, § 1, 10 Gammel 414 (1892).

(8) Laws of the State of Texas 1901, ch. 8, § 1, at 12.

(9) Laws of the State of Texas 1911, ch. 10, § 1, at 80.

(10) Laws of the State of Texas 1921, ch. 6, § 1, at 264.

(11) Laws of the State of Texas 1951, ch. 31, § 1, at 48.

(12) Laws of the State of Texas 1961, ch. 256, § 1, at 544.

A slightly different method of apportionment governed from 1869 until 1875. See note 46 infra.

the population mean ranging from +82.8% to +294% and ratios of these districts to the smallest district ranging from 2.13–to–1 to 4.63–to–1,[21] the Court

21.

| Flotorial Districts Under H.B. 195 | Counties | Population | Percentage of Deviation from Ideal District of 63,864 | Pop. Variance Ratio of Flotorial District to Smallest District in H.B. 195 of 54,385 |
|---|---|---|---|---|
| 15F | x Smith | 86,350 | | |
| | * Rusk | 36,421 | | |
| | | 122,771 | + 92.2% | 2.26 to 1 |
| 20F | x Brazoria | 76,204 | | |
| | * Ft. Bend | 40,527 | | |
| | | 116,731 | + 82.8% | 2.13 to 1 |
| 32F | x Grayson | 73,043 | | |
| | * Collin | 41,247 | | |
| | * Rockwall | 5,878 | | |
| | | 120,168 | + 88.2% | 2.21 to 1 |
| 36F | x McClennan | 150,091 | | |
| | * Coryell | 23,961 | | |
| | | 174,052 | + 172.5% | 3.20 to 1 |
| 38F | x Bell | 94,097 | | |
| | * Williamson | 35,044 | | |
| | | 129,141 | + 102.2% | 2.37 to 1 |
| 40F | x Travis | 212,136 | | |
| | * Burnet | 9,265 | | |
| | | 221,401 | + 246.7% | 4.07 to 1 |
| 46F | x Nueces | 221,573 | | |
| | * Kleberg | 30,052 | | |
| | | 251,625 | + 294.0% | 4.63 to 1 |
| 48F | x Cameron | 151,098 | | |
| | * Willacy | 20,084 | | |
| | * Kenedy | 884 | | |
| | * Brooks | 8,609 | | |
| | | 180,675 | + 182.9% | 3.32 to 1 |
| 62F | x Taylor | 101,078 | | |
| | * Jones | 19,299 | | |
| | * Haskell | 11,174 | | |
| | | 131,551 | + 106.0% | 2.42 to 1 |
| 69F | x Ector | 90,995 | | |
| | * Winkler | 13,652 | | |
| | * Loving | 226 | | |
| | * Reeves | 17,644 | | |
| | | 122,517 | + 91.8% | 2.25 to 1 |
| 77F | x Lubbock | 156,271 | | |
| | * Crosby | 10,347 | | |
| | | 166,618 | + 160.9% | 3.06 to 1 |
| | Average Percentage of Deviation | | | + 147.3% |

x Denotes "dominant" counties which also comprise by themselves another state representative district.

* Denotes "appurtenant" counties whose citizens vote in only one state representative district.

sustains this contention. The two examples from H.B. 195 discussed below illustrate the population disparities present in these flotorial districts.

 The first example is District 46F which has the greatest population variation of the eleven challenged districts. The composition of District 46F includes Nueces County, with a population of 221,573,[22] and Kleberg County, with a population of 30,052. Nueces County, which alone constitutes District 45 and receives three places therein, will be referred to as the "dominant" county.[23] Kleberg County, which has no representation in any district other than 46F, will be referred to as the "appurtenant" county.[24] The 251,625 inhabitants of the two counties elect four Representatives, in all. Inasmuch as the population of an ideal or average district in Texas is 63,864,[25] the defendants argue that the 251,625 people of Kleberg and Nueces Counties combined elect four Representatives, and thus there is one Representative for every 62,906 persons. This would mean the average overrepresentation is 1% for the four districts.[26] In total, this conclusion is correct. This analysis does not approach the problem correctly, however. The ratio of this district, the most populous in the State, to District 81, the least populous, is 4.63 to 1. The population of 46F deviates from the mean of 63,864 by 294%. This is an egregious disparity. Additionally, the situation of the voters in Kleberg County, the appurtenant county in this district, emphasizes the extreme dilution effected by H.B. 195 in District 46F. With a population of 30,052, the votes of

Kleberg County residents should equal approximately $\frac{1}{2}$ $\frac{(30,052)}{(63,864)}$ of the total necessary to elect one Representative to the House of Representatives. It is self-evident that the potential value of the votes of the residents of Kleberg County equals not $\frac{1}{2}$ of District 46F, but instead equals only $\frac{1}{8}$ $\frac{(30,052)}{(251,625)}$ of the total necessary to elect the sole Representative for whom they can vote. Thus, the vote of a resident of Kleberg County is diluted so that it only has 25% of the weight that it should ideally have.

The second example is District 20F, which has the least population disparity of the eleven challenged districts. The composition of District 20F includes Brazoria County with a population of 76,205 and Fort Bend County with a population of 40,527. Fort Bend County, the "appurtenant" county, has no representation in any district other than District 20F. Brazoria County, the "dominant" county, alone constitutes District 19, which is allocated one place, so the 116,731 inhabitants of these two counties elect two Representatives, in all. The ratio of this district to District 20F, the least populous in the State, is 2.13 to 1. Although this is the lowest ratio of any of the eleven flotorial districts, such a ratio is invidious *per se* under *Reynolds*. The population of 20F deviates from the mean of 63,864 by +82.8%. Although the votes of the residents of Fort Bend County should equal approximately $\frac{2}{3}$ of the total necessary to elect one Representative, they equal only $\frac{1}{3}$,

22. Population figures are official United States Census Bureau statistics.

23. For purposes of this opinion, the Court defines a "*dominant*" county as one which has "more than sufficient population to be entitled to one or more Representatives," which is included in a flotorial district, but which is represented additionally in a district other than the flotorial district.

24. For purposes of this opinion, the Court defines an "appurtenant" county as one which does not have sufficient population to be entitled to at least one Representative, which is included in a flotorial district, and which has no representation in any district other than its flotorial district.

25. Dividing the 1960 population of Texas of 9,579,677 by the 150 districts created by H.B. 195 yields an average or ideal district population of 63,864.

26. See note 68 infra.

and thus have merely 50% of their proper value. Although the percentages vary, similar dilution exists in the remaining nine flotorial districts,[27] the average deviation for the eleven being +147.3%.

The dilution of the value of these votes in the "appurtenant" counties such as Kleberg and Fort Bend denies equal protection of the law to the citizens who reside in these "appurtenant" counties and is impermissible on any ground, the Constitution of the State of Texas and prior history notwithstanding. The vote of any citizen must be approximately equal in weight to that of any other citizen in the State, Reynolds v. Sims, supra, and 50% is not "approximate equality." See Honsey v. Donovan, 236 F.Supp. 8 (D.Minn.1964), and in particular at page 20. As is demonstrated by footnote, valid flotorial districts can be created in Texas pursuant to said Section 26.[28] And as should be apparent

27. Note 21 supra.

28. The Court will utilize the following example to illustrate one method of creating a flotorial district which would satisfy the requirements of the Equal Protection Clause and Article 3, Section 26 of the Texas Constitution. As composed under the example, Bell County, styled as District A, would receive one representative; Williamson, Milam, Robertson, and Falls Counties combined, styled as District B, would receive one representative; and Districts A and B combined, styled as District F, would receive an additional representative. The chart below indicates the result.

| DISTRICT | COUNTIES | NUMBER OF REPRESENTATIVES | POPULATION |
|---|---|---|---|
| A | Bell | 1 | 94,097 |
| B | Williamson | 1 | 35,044 |
| | Milam | | 22,263 |
| | Robertson | | 16,157 |
| | Falls | | 21,263 |
| | | | 94,727 |
| F | Bell | 1 | 94,097 |
| | Williamson | | 35,044 |
| | Milam | | 22,263 |
| | Robertson | | 16,157 |
| | Falls | | 21,263 |
| | | | 188,824 |

Analysis

1. Ideal average district $63,864 \times 3$ 191,592
2. Population of Districts A, B, and F 188,824
3. Total deviation 2,768

4. Average deviation/District $\left(\dfrac{2,768}{3}\right)$ 922

5. Per cent deviation/District $\left(\dfrac{922}{63,864}\right)$ 1.4%

The proper view of the method, of course, requires that each citizen's vote receive its proper weight. The voters in Milam County should be able to elect one-third of a representative, and they could: $22/94 + 22/188 = 66/188$ or $1/3$; the voters in Bell County should be able to elect one and one-half representatives, and they could: $94/94 + 94/188 = 282/188$ or $1\frac{1}{2}$. Thus, this flotorial district would be valid in all respects. *The Court emphasizes that the foregoing is an example only,* which does not indicate any feeling or opinion of this Court as to how the Legislature should compose any particular

from what has been said thus far, the Court does not hold to be unconstitutional that portion of Article 3, Section 26 of the Constitution of the State of Texas, which authorizes the creation of flotorial districts. The Court does find as a fact and conclude as a matter of law (a) that the numerical composition of such flotorial districts violates the Fourteenth Amendment; (b) that such composition so dilutes voting strength in such districts as to cause discrimination which is invidious *per se;* and (c) that Districts 15F, 20F, 32F, 36F, 38F, 40F, 46F, 48F, 62F, 69F and 77F are therefore invalid.

Before leaving our review of the flotorial districts, we further find that their composition is based upon more than one hundred years of precedent in Texas. And also, that the discrimination which occurs, invidious though it be, results from a good-faith attempt by the Legislature to meet the requirements of the federal Constitution, the State Constitution, and this Court. This is evidenced by the legislative history of H.B. 195, most of which is contained in the deposition of Honorable G. F. Mutscher taken by defendants and introduced in evidence, first by plaintiffs as their Exhibit 17 and then by defendants as their Exhibit 19. He was Chairman of the Committee on Congressional and Legislative Districts which conducted extensive hearings before undertaking to write the Bill.

Attached to Chairman Mutscher's deposition is an extract from the House of Representatives Journal, pages 3502–3505, under date of May 31, 1965. It is entitled "Remarks by the Honorable G. F. Mutscher Pertaining to House Bill No. 195," which we shall refer to as the "Mutscher report" and treat as the Committee report, since no formal Committee report as such appears to have been printed. The Mutscher deposition and report provide the most reliable evidence in the record as to what was done by the Legislature, and why, in the preparation of H.B. 195.

The Mutscher report explains why the Committee found it necessary to use flotorial districts, and it reflects their computation of the deviations of populations in such districts from the population of an ideal district. For example, Chairman Mutscher says they consist of "two districts with a deviation of more than 10%. * * * Both are 13% below the ideal population." The record is barren of any indication that any Member of the House, or anyone else, thought at that time that the Committee computations were incorrect. Since the Committee was using 15% deviation from the ideal district as its standard, and all districts so computed having met that standard, it is apparent that the flotorials would have been differently constituted had the Committee and the Legislature realized that the deviations in these districts should be computed as found by this Court. The deviations in these districts when computed as this Court finds they should be, were unintended and not anticipated.

To further test the composition of these districts and in considering the remedy to be adopted by this Court, we have hypothesized them as multi-member district in the future. Neither is it a suggestion that this area of Texas be apportioned in this manner.

It should be noted that this type of flotorial district has historical precedent from Texas' earliest days. See, for example, the 1850 apportionment statute in which Gillespie and Comal Counties constituted District 43, Bexar and Medina Counties constituted District 44, and the four counties combined constituted (flotorial) District 45. Other examples in that statute of flotorial districts in which all constituent counties had separate, additional representation are Districts 3 and 9. See note 20 supra. Under the 1853 statute, additional examples are Districts 11, 14, 25, and 58, note 20 supra. Under the 1860 statute, examples are Districts 25, 30, 33, and 52, note 20 supra. There are examples under the statutes of 1875 (9); 1882 (15, 51, 62, and 72); 1892 (13, 17, 24, 48, 64, 70, and 72); 1911 (38, 59, 67, and 127); 1921 (38 and 60); and 1951 (15F), note 20 supra.

districts and compared their deviations and ratios as multi-member districts with their deviations and ratios as flotorial districts.[29] So hypothesized, the maximum deviation from the ideal district would be 13.3% and occur in Districts 15F and 40F; and, the ratio of the population in the most populous flotorial district to the least populous district of H.B. 195, would be 1.21 to 1 and occur in District 62F.

By a comparison of the schedule contained in footnote 29 with the one in Appendix "C", it is seen that if the flotorial districts as presently composed were treated as multi-member districts and the remaining districts were left as presently composed, the maximum range of deviation would remain at 26.4% and the population-variance ratio would remain at 1.31 to 1. In other words, if this were done, the maximum range of deviation and population-variance ratio for all districts would remain as they now exist in the remaining districts. And this leads to our examination of plaintiffs' charges of population disparity in the remaining districts.

B. *Other Than Flotorial—Remaining Districts:*

In their original brief, plaintiffs predicate the unconstitutionality of the remaining districts primarily on the 26.4% maximum range of deviation in population. This maximum range extends from a minus 14.8% to a plus 11.6%, as related to the population of the ideal district. Plaintiffs assert this range to be unreasonable, unnecessary, and invidiously discriminatory. As authority, they cite Reynolds v. Sims, 377 U.S. at 577, 84 S.Ct. 1362 (1964); and, the recent three-judge court decision of Toombs v. Fortson, 241 F.Supp. 65 (N.D.Ga.1965), in which case the variances from the

29.

### Treated as Flotorial District

| District | Population | No. of Rep's. | Deviation | Ratio to 54,385 * |
|----------|-----------|---------------|-----------|-------------------|
| 15F | 122,771 | 1 | + 92.2% | 2.26 |
| 20F | 116,731 | 1 | + 82.8% | 2.13 |
| 32F | 120,168 | 1 | + 88.2% | 2.21 |
| 36F | 174,052 | 1 | + 172.5% | 3.20 |
| 38F | 129,141 | 1 | + 102.2% | 2.37 |
| 40F | 221,401 | 1 | + 246.7% | 4.07 |
| 46F | 251,625 | 1 | + 294.0% | 4.63 |
| 48F | 180,675 | 1 | + 182.9% | 3.32 |
| 62F | 131,551 | 1 | + 106.0% | 2.42 |
| 69F | 122,517 | 1 | + 91.8% | 2.25 |
| 77F | 166,618 | 1 | + 160.9% | 3.06 |

### Treated as Multi-Member District

| District | Population Per Representative | No. of Rep's. | Deviation | Ratio to 54,385 * |
|----------|------------------------------|---------------|-----------|-------------------|
| 15F | 61,385 | 2 | − 3.9% | 1.13 |
| 20F | 58,365 | 2 | − 8.6% | 1.07 |
| 32F | 60,084 | 2 | − 5.9% | 1.10 |
| 36F | 58,017 | 3 | − 9.2% | 1.07 |
| 38F | 64,570 | 2 | + 1.1% | 1.19 |
| 40F | 55,350 | 4 | − 13.3% | 1.02 |
| 46F | 62,906 | 4 | − 1.5% | 1.16 |
| 48F | 60,225 | 3 | − 5.7% | 1.11 |
| 62F | 65,775 | 2 | + 3.0% | 1.21 |
| 69F | 61,258 | 2 | − 4.1% | 1.13 |
| 77F | 55,539 | 3 | − 13.0% | 1.02 |

* Population of smallest district under H.B. 195.

■ **425**

average (which in the language of our case would be, deviations from the ideal) were held to be invidious *per se.*

Defendants say in general that if the population disparity is not manifestly unreasonable—that is, if it does not manifestly constitute invidious discrimination—it is (in the language of defendants' briefing) "within the limits of the Legislature's unreviewable discretion."[30] Specifically, defendants say that the population disparities of H.B. 195 are within permissible limits and that the apportionment plan meets the requirements of the Equal Protection Clause, but additionally, they express the view that since the plus and minus deviations from the ideal are less than 15% and the range of such deviations are less than 30%, such deviations are manifestly reasonable and therefore not reviewable. Defendants, of course, measure disparities by these deviations.

While not using the term "unreviewable discretion," plaintiffs generally acknowledge that a deviation of 4% is *de minimis* and therefore will not be noticed by a reviewing court. Without adopting either defendants' label of unreviewable discretion or plaintiffs' label of *de minimis*, it would seem that in the view of both plaintiffs and defendants there is a degree of deviation which a reviewing court will consider manifestly reasonable or reasonable *per se.*

Thus, it would appear that the real difference between the parties as to what in the words of plaintiffs is *"de minimis"* or what in the words of defendants is "within the limits of the Legislature's 'unreviewable discretion,'" is the degree of deviation from the ideal district, that is, whether it is 4% or 15%.

Until later elucidation might come from the Supreme Court, the Court in Toombs v. Fortson, supra, said that, for Georgia, it would "base any test as to the reasonableness of variances on the departure figure of 15%." In other words, any variance above 15% would be regarded as invidious *per se* by the *Toombs* Court. We do not regard *Toombs* as authority for holding either that the range of deviation in this case is invidious *per se*, or that, being less than 30%, it is manifestly reasonable. Perhaps it would be more convenient for plaintiffs and defendants if this Court were to set a maximum limit for reasonableness in deviation or variance, as was done in *Toombs.* But, in view of (a) the good response made by the Legislature to the Court's first order entered in this case, and (b) the lack of any necessity for doing so, the Court will not set such maximum limit at this time.

■ By pleading that this Court declare Senate Bill 318[31] to be the plan of

---

30. Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946); Bain Peanut Co. of Texas v. Pinson, 282 U.S. 499, 51 S.Ct. 228, 75 L.Ed. 482 (1931).

Thigpen v. Meyers, 211 F.Supp. 826 (W.D.Wash.1962), aff'd. 378 U.S. 554, 84 S.Ct. 1905, 12 L.Ed.2d 1024 (1964); Thigpen v. Kramer, Civil No. 5597, W.D. Wash., Mar. 9, 1965; Toombs v. Fortson, 241 F.Supp. 65 (N.D.Ga.1965); Stout v. Bottorff, 246 F.Supp. 825 (S.D.Ind. 1965).

Preisler v. Doherty, 365 Mo. 460, 284 S.W.2d 427 (1955); People ex rel. Woodyatt v. Thompson, 155 Ill. 451, 40 N.E. 307 (1895); People ex rel. Carter v. Rice, 135 N.Y. 473, 31 N.E. 921, 16 L.R.A. 836 (1892); Preisler v. Hearnes, 362 S.W.2d 552 (Mo.S.Ct.1962); Jackman v. Bodine, 44 N.J. 414, 209 A.2d 825

(1965); Silver v. Brown, Cal.S.Ct. Sep. 1, 1965, 46 Cal.Rptr. 308, 405 P.2d 132. H.R. 5505, 89th Congress, 1st Sess., and House of Representatives Report No. 140, 89th Congress, 1st Sess.

45 Am.Pol.Sci.Rev. 153 (1951).

31. As their Exhibit No. 11, plaintiffs offered in evidence a Monograph entitled Legislative Redistricting in Texas, by Professors Luther G. Hagard, Jr., August O. Spain, and plaintiffs' witness Samuel B. Hamlett, published by The Arnold Foundation, 1965. In his deposition, Professor Hamlett testified that the study set out in the Monograph was the result of a suggestion by plaintiff Senator Kennard that a single-member district plan be developed, since he knew of none having been developed.

apportionment for Texas, and by offering their extensive proof in support of this plan, plaintiffs at the very least have judicially admitted that in this case a range in deviation from minus 8.7% to plus 6.9%, and a maximum range of 15.6%, are constitutionally permissible.

Having set the frame of reference, we return to the particular deviations and ratio of H.B. 195. While not included in plaintiffs' brief, other computations are of significance in considering the maximum deviation in the evaluation of plaintiffs' charge. For example, the average deviation for the remaining districts is 12.7%, extending from a plus 6.01% to a minus 6.7%. The population of and deviations in all of the remaining districts as computed by the Court are shown in Appendix "C." The ratio of the population in the largest of the remaining districts to that of the smallest of such districts is 1.31 to 1.

██ In order to establish the lowest limit of invidiousness *per se* for use in our consideration of this case only, we accept the ratio of 1.7 to 1 provided by the Supreme Court in *Lucas,* supra.[32] Compared to the 1.7-to-1 ratio of *Lucas,* the 1.31-to-1 ratio of H.B. 195 is 30% lower. In other words, on the basis of ratio, H.B. 195 is 30% closer than *Lucas* to the ideal apportionment based substantially upon population.

By the *Lucas* standard, H.B. 195 at least arguably apportions the Texas House substantially on a population basis, and plaintiffs have the burden of persuasion to show that it is not so apportioned. But at the same time and to repeat, we do not hold that the 1.31-to-1 population variance ratio of the Bill, or its maximum deviation of 26.4% or its average deviation of 12.7%, places the Bill beyond the reach of this Court's review as may be contended by defendants.

██ References to percentages of deviation and ratios from other cases are not dispositive of this case because as the Supreme Court so cogently points out, "What is marginally permissible in one State may be unsatisfactory in another, depending upon the particular circumstances of the case." *Reynolds,* 377 U.S. at 578, 84 S.Ct. at 1390. The Supreme Court has not established "rigid mathematical standards" for evaluating legislative apportionments, but has observed that, "Rather, the proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in rec-

---

The Model Plan (Senate Bill 318) contains thirty-three plats showing how certain of the districts would be composed. In all instances where district lines are not contiguous with county lines, their composition is described by census and sub-census tracts.

This Monograph is significant because it contains Senate Bill 318, introduced in the Texas Senate by plaintiff Senators Spears and Kennard and which in their pleadings plaintiffs pray that this Court declare to be the scheme of apportionment for the House of Representatives. Professor Spain explains in the Monograph that plaintiffs' plan (Senate Bill 318) was "designed by Professors Luther G. Hagard and Samuel B. Ham-

lett * * * [and] * * * involved numerous professional consultations in which the present writer [Professor Spain] was privileged to share." The Monograph designates the apportionment plan "A Model for Texas," and plaintiffs have embraced it in their pleadings, evidence, and briefs. Plaintiffs' plan, Senate Bill 318 and the Arnold Foundation Plan, being one and the same, provides a maximum range of deviation from the ideal district from a maximum "overage" or minus 8.7% to a maximum "underage" or plus 6.9%, or a maximum range of 15.6%.

32. See note 18 supra and accompanying text.

ognizing certain factors that are free from any taint of arbitrariness or discrimination." Roman v. Sincock, 377 U.S. at 710, 84 S.Ct. at 1458.[33]

Plaintiffs cite no case in which the total range of deviation in population comparable to the 26.4% and 12.7% in issue here, did not satisfy the command of *Reynolds*. Diligent research has disclosed no such case.

In following the judicial approach of *Roman*, supra, this Court will bear in mind the further teaching of the Supreme Court found in *Reynolds* at page 579 of 377 U.S., at page 1391 of 84 S. Ct., to the effect that "[s]o long as the divergences from a strict population standard * * * based on legitimate considerations incident to the effectuation of a rational state policy [are involved] some deviations from the equal-population principle are constitutionally permissible."

Basic to the consideration of this case is the proposition that any Texas reapportionment statute must first meet the requirements of the United States Constitution and then, to the extent there is no conflict, it must meet the requirements of the Texas Constitution, the applicable provision of which is Art. 3, Sec. 26.[34]

This provision must be interpreted by this Court in order to determine the necessity, if any, for accommodating it to the requirements of the federal Constitution. This involves a question of State law, but our research has revealed no decision in point. The Court must therefore make its own interpretation.

In explanation of H.B. 195 and the State policy it is claimed to effectuate, defendants offered in evidence a copy of the opinion of the Attorney General of Texas dated May 1965, addressed to the Speaker of the House of Representatives.[35] While not binding on this Court, such an opinion is entitled to weight. Perry v. Larson, Coll. of Internal Revenue, 104 F.2d 728 (5th Cir. 1939).

The Court has concluded that the opinion of the Attorney General (a) correctly interprets the requirements of Section 26, and (b) correctly recognizes that if the keeping of counties intact should result in a violation of the federal Constitution, then the county lines would have to be violated, but only to the extent necessary for such compliance.[36] The Court finds that Section

---

33. "Our affirmance of the decision below is not meant to indicate approval of the District Court's attempt to state in mathematical language the constitutionally permissible bounds of discretion in deviating from apportionment according to population." 377 U.S. at 710, 84 S.Ct. at 1458. (Footnote omitted.)

34. "Sec. 26. The members of the House of Representatives shall be apportioned among the several counties, according to the number of population in each, as nearly as may be, on a ratio obtained by dividing the population of the State, as ascertained by the most recent United States census, by the number of members of which the House is composed; provided, that whenever a single county has sufficient population to be entitled to a Representative, such county shall be formed into a separate Representa-

tive District, and when two or more counties are required to make up the ratio of representation, such counties shall be contiguous to each other; and when any one county has more than sufficient population to be entitled to one or more Representatives, such Representative or Representatives shall be apportioned to such county, and for any surplus of population it may be joined in a Representative District with any other contiguous county or counties."

35. The Opinion is set forth verbatim in Appendix "D."

36. See p. 431 this opinion. Plaintiffs argue that the "consistently high departures from the ideal" in the remaining districts were not necessary, and that this Court should substitute its judgment as to what was necessary in H.B. 195, for that of the Legislature.

26 embodies the State policy to maintain the integrity of counties and county lines, that such is a rational policy, and that H.B. 195 was drawn in an effort to comply with the Attorney General's opinion.[37]

■ In *Reynolds* the Supreme Court has said that there is no inherent federal constitutional infirmity in the maintenance of county integrity as the basis for legislative districts *so long as any population variance between districts is not significant*. The Court went on to observe that, "Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering." 377 U.S. at 578, 579, 84 S.Ct. at 1390. The word "significant" is not defined in the Court's Opinion. This Court will accept the definition in Webster's Third New International Dictionary, which is consistent with *Reynolds*, as follows:

"1: Having meaning: esp: full of import * * *

2a: suggesting or containing some concealed, disguised or special meaning:"

In this sense, neither the maximum range of deviation, the individual differences in deviation between particular districts, nor the population variance ratio of 1.31 to 1, as such, is significant. Whether or not these differences are important in the light of plaintiffs' claims of political and racial gerrymandering is discussed later.

Returning to our consideration of the deviations and population variance ratios of H.B. 195, plaintiffs rely heavily upon and quote extensively from Calkins v. Hare, 228 F.Supp. 824 (E.D.Mich.

1964), in support of their contention that virtual mathematical equality is necessary for constitutional validity of state legislative districts; and, indeed the language is thoughtful and impressive. But *Calkins* is a congressional case decided by the United States District Court for the Eastern District of Michigan, before the Supreme Court decided *Reynolds*, supra. The significance of this timing is that the Supreme Court in *Reynolds*, a state reapportionment case like this, relaxed the more severe requirement of Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), which was followed in *Calkins* by saying, "Somewhat more flexibility may * * * be constitutionally permissible with respect to state legislative apportionment than in congressional districting." *Calkins* being a congressional case decided by a District Court, and *Reynolds* having been decided later by the Supreme Court, *Calkins* is not the beacon to be followed in this state reapportionment case.

In their Supplemental Brief, plaintiffs expand their argument concerning deviation in several different ways, the most significant of which concerns the burden of proof. Plaintiffs argue that this burden shifts to the defending party in an apportionment case when the attacking party shows that a better plan of apportionment could have been achieved. In the previous Section styled Burden of Proof, the Court rejected this concept.

Another argument contained in their later brief proceeds from a candid recognition that certain deviations, which in Supreme Court language they categorize as "minor," may be justified by a constitutionally permissible, rational State policy, if necessarily related to that pol-

---

**37.** See Opinion, p. 423, supra. Representative Mutscher testified at pp. 431–434 that in preparing H.B. 195, the Attorney General's Opinion was followed and the Mutscher report is to the same effect.

icy. Plaintiffs argue two instances of minor deviations which they deem apparently (obviously) arbitrary and therefore not justified by such policy. Plaintiffs say such minor deviations are "tainted."

Plaintiffs rely upon the Supreme Court language contained in *Roman*, supra, referred to numerous times in this opinion. The Court, there, used the word "taint" and from it, plaintiffs postulate what they call "the taint rule." But we find no new concept in the so-called taint rule. We are of the opinion that in *Roman* the Supreme Court simply used the noun "taint" in restating the elementary rule of constitutional law, that a classification having an arbitrary and therefore discriminatory basis violates the Equal Protection Clause. This argument will be evaluated by this elementary rule.

The main factual ground upon which plaintiffs rely to demonstrate the so-called taint of H.B. 195 concerns not ratios or percentages of deviation, which are the criteria of the controlling apportionment decisions, but instead concerns numbers. They argue that Dallas County, with a population of 951,527 is "patently" entitled to 15 Representatives instead of 14. Further, they argue that Bexar County should have received 11 Representatives rather than 10. They show that, arithmetically, the addition of a Representative in each district would almost achieve mathematical perfection, and that it would almost eliminate any deviation whatsoever in these districts. Plaintiffs query, "What possible 'rational' and constitutionally permissible policy of State prevented the Texas Legislature from giving [these districts] the * * * representatives [their] population demanded?"

The answer is contained in their own evidence, the Arnold Foundation Monograph,[37a] which shows that districting is a mechanical process and that the decision to delineate any particular district necessarily affects all other districts in the State, ultimately. Plaintiffs' plan, the preparation of which is explained in the Monograph, took a year to complete because, as it points out, "when an initial string of hypothesized districts through a region pushed an inadequate population fragment into a corner, backtracking [was necessary] to find compensating adjustments on diverse compass bearings * * *." Professor Hamlett explained that " * * * it [was] necessary to indulge in considerable surgery on Brazoria County" because " * * * here is [another] situation where the mechanics of the situation necessitated our deviating from our desire to adhere as much as possible to county lines * * *. [W]e are blocked into the corner." Professor Hamlett and his colleagues used "compensating adjustments" in developing plaintiffs' plan, and such accords with a rational State policy. Reynolds v. Sims, 377 U.S. at 578, 84 S.Ct. at 1390.

The Legislature did the same in their attempt to maintain county integrity within permissible limits of deviation. In his cross-examination, Chairman Mutscher explained their solution to these differences. He testified generally "that tolerances in some cases had to be adjusted in favor of the metropolitan areas and sometimes the other way." As to Dallas County, he testified that "After working with the delegation and trying to accept the advice that they had to pass on to us, they felt that the fourteen was a reasonable figure." Thus, in preparing its plan, the Legislature encountered substantially the same problems encountered by those who prepared the plans approved by plaintiffs, and went about solving these problems in much the same way.

For the purpose of further evaluating this argument concerning the claimed underrepresentations and overrepresentations, they have been tabulated in Table

37a. Note 31 supra.

1 below, for comparison with certain underrepresentations and overrepresentations of which plaintiffs approve, tabulated in Table 2, as follows:

### Table 1

| District | County | Complained of by Plaintiffs | |
|---|---|---|---|
| | | % Under–representation | % Over–representation |
| 22 | Harris | 0 | 7.0 |
| 33 | Dallas | 7.0 | 0 |
| 57 | Bexar | 8.0 | 0 |

Percentages taken from Plaintiffs' Exhibit No. 4.

### Table 2

| Proposed District | Proposed County Composition | Approved by Plaintiffs | | | | | |
|---|---|---|---|---|---|---|---|
| | | Plaintiffs' Plan * Representation | | PARC "A" ** Representation | | PARC "B" *** Representation | |
| | | Over | Under | Over | Under | Over | Under |
| 33 | Gregg | 0 | 8.7 | | | | |
| 96 | Medina et al. | 6.9 | 0 | | | | |
| 17 | Van Zandt et al. | | | 0 | 10.8 | | |
| 47 | Bandera et al. | | | 9.6 | 0 | | |
| 14 | Van Zandt et al. | | | | | 0 | 10.8 |
| 60 | Potter | | | | | 9.6 | 0 |

\* Plaintiffs' Exhibit 11, pp. 12, 20 and 25, Arnold Foundation Monograph B.
\** Exhibit 1 of Plaintiffs' Exhibit 14–1, the McCleskey deposition.
\*** Exhibit 1 of Plaintiffs' Exhibit 14–1, the McCleskey deposition.

The percentages of underrepresentation complained of in Districts 33 and 57 of H.B. 195 as shown in Table 1 are conspicuously less than the percentage of underrepresentation urged by plaintiffs as constitutional for Gregg County (their proposed District 33) under their plan as shown in Table 2; and, the percentage of overrepresentation in District 22 is substantially the same (6.9% compared with 7.0%) urged by plaintiffs as constitutional for Medina and other counties (their proposed District 96). Also, the percentages complained of in the three H.B. 195 districts are substantially less than those which plaintiffs find constitutional in PARC Plans "A" and "B" for the counties shown in Table 2.

The three plans referred to in Table 2, which find such favor with plaintiffs, were prepared by experts in the field of government, working in the calm atmosphere of their academic pursuits. Their work was tedious and extended over long periods of time. Even with such care in preparation, these experts found it necessary to create districts containing underrepresentations and overrepresentations of the magnitude set forth in Table 2. The Court finds in the testimony of these experts and in their product, as well as in the testimony of Chairman Mutscher, a reasonable explanation and justification for the minor deviations of which plaintiffs here complain, in Districts 22, 33, and 57.

Other undisputed testimony offered by plaintiffs which concerns District No. 22, Harris County, supports this conclusion. Chairman Mutscher testified about District 22 as follows:

"District No. 22 was explained to us by the members of the Harris County delegation as a district that probably today already has more people in it than the twenty-four [sic], and the growth potential was in this area, and that by the 1970 census, it would very adequately prove that this would be the most logical place to put the seventh member."

Next, in their Supplemental Brief plaintiffs urge their postulated "best plan rule" which we have not found articulated either as a new constitutional doctrine or as a gloss on an old doctrine. In their Supplemental Brief plaintiffs concede that the State policy to maintain county integrity in reapportionment "is an instance of a rationally and constitutionally permissible State policy which may justify population departures of a minor nature as necessarily related to that policy." But in the final analysis, this argument of plaintiffs proceeds on the premise that the deviations of H.B. 195 really are not of a minor nature.

The Court understands their best-plan-rule argument to be as follows:

(1) That the remaining districts contain "consistently high departures from the ideal * * * which it is patently clear * * * were not necessary to effect a districting scheme preserving the integrity of county lines. * * *"

(2) That the "cumulative high range of minor deviations contained in H. B. 195 is unnecessary."

(3) That this is demonstrated by three better plans introduced in evidence by plaintiffs, each of which contained lower ranges of deviation.

(4) That this violates the mandate of *Reynolds* which requires an appor-

tionment to be as "nearly as practicable" to the ideal, which plaintiffs extrapolate into their best plan rule.

■ This argument does not complain of the magnitude of the maximum or average range of deviations, or of the ratio of variance in population contained in H.B. 195, as was done in their first brief. Their argument here seems to be made in the alternative, but we regard it as being embraced within the attack last above mentioned, as to which we have held adversely to plaintiffs' position. But more importantly, in reviewing the validity of an apportionment statute, it is not within the reach of the Court's inquiry to determine which is the better or best, wiser or wisest, of two or more apportionment proposals.

The only function of this Court is to gauge the validity of an apportionment as adopted by the Legislature, by the requirements of the federal Constitution for which the best plan search is not appropriate. Whether or not the Legislature might have made a better or wiser choice than H.B. 195 is not a justiciable question because there is no judicially discoverable and manageable standard for reviewing the legislative choice as between one or more apportionment plans. Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Coleman v. Miller, 307 U.S. 433, 454–455, 59 S.Ct. 972, 83 L.Ed. 1385 (1939).

The concern of the federal Constitution, and therefore of this Court, is not that which might have been done, but that which was done. Sincock v. Roman, 233 F.Supp. 615, at 619 (D.Del.1964), and Boineau v. Thornton, 235 F.Supp. 175, 182 (E.D.S.C.1964). We quote with approval from the Opinion of the Court in the latter case:

"Whether or not the Legislature might have made a wiser choice is not a justiciable question. There are those who find desirability in some provision for minority representation, and various schemes for cumulative and proportional voting

have their advocates. It was the Legislature's prerogative, however, to weigh the contending considerations and to make an enlightened choice among the several alternatives open to it. As long as the alternative it selected cannot be said to be arbitrarily unfair or discriminatory, it cannot be said to be impermissible under the Fourteenth Amendment."

In conclusion, we find (1) that plaintiffs' have not discharged their burden of proving the remaining districts unconstitutional; and (2) that plaintiffs' evidence demonstrates that under the circumstances existing in Texas, the remaining districts provided for in H.B. 195 represent a faithful adherence to a plan of population-based representation and that they contain only minor deviations which the Court finds to be reasonable and therefore not arbitrary. Accordingly, the Court concludes that the remaining districts do not violate the Equal Protection Clause of the United States Constitution.

## Gerrymandering

Plaintiffs contend that the apportionment of Texas into single-member, multi-member and flotorial districts, rather than into single-member districts only, is the arbitrary, capricious result of gerrymandering, for partisan advantage and that "their use constitutes a scheme designed to minimize or cancel

out the voting strength of racial and political elements (i. e., the Republican Party, liberal democrats and the Negro race) within said districts." They claim that the combination plan of H.B. 195 results in constitutionally proscribed political and racial gerrymandering, which are embraced in Issue 2 and we shall take up first the claim of political gerrymandering.

### A. Political

Although the etymology of the gerrymander is known,[38] the constitutional source for a cause of action entitling a party to relief upon proof thereof is not. Suits based upon allegations of political gerrymandering seem to draw their vitality from some dicta in Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965),[39] but such dicta is inapposite and cannot be the basis for this Court, or any Court, to grant relief merely because someone feels that he or his political party has been gerrymandered. The Equal Protection Clause demands that one man's vote be substantially equal in weight to the vote of any other man, and no more.

The right protected is the right to vote, which is a personal right,[40] and the federal Constitution guarantees no political party the right to have a state so apportioned that a candidate from such party's membership, or from a particular faction, splinter or segment of such membership, will be elected,[41]

---

**38.** "The word has its roots in early American history, having been coined in 1812 to describe a salamander shaped district drawn for the eastern shore of Massachusetts during the administration of Governor Elbridge Gerry. 'How's that for a salamander?' the party who first noted the resemblance of the district to the reptile was reported to have asked. 'Better call it a Gerrymander' was the recorded retort which made etymological history. See Tabor, The Gerrymandering of State and Federal Legislative Districts, 16 Md.L.Rev. 277, 278 n. 6 (1956)." Comment, 72 Yale L.J. 1041 n. 1 (1963).

**39.** "It might well be that, designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the vot-

ing strength of racial or political elements of the voting population. When this is demonstrated it will be time enough to consider whether the system still passes constitutional muster." 379 U.S. at 439, 85 S.Ct. at 501.

**40.** Reynolds v. Sims, 377 U.S. at 561, 84 S.Ct. at 1381; Sims v. Baggett, 247 F. Supp. 96 (M.D.Ala.1965); Silver v. Jordan, 241 F.Supp. 576, 580 (S.D.Cal. 1965).

**41.** It is doubtful that a political party, suing on its own behalf as a political party, would have standing to challenge the validity of an apportionment statute. See Baker v. Carr, 369 U.S. at 204–208, 82 S.Ct. at 703–705; Reynolds v. Sims, 377 U.S. at 561, 84 S.Ct. at 1381.

nor does it guarantee the right even to have the best or better, or even poorer, opportunity to be elected. No citizen and no political party or any other group or organization can claim a personal right protected by the federal Constitution which assures him that he or it will be represented in any legislative body by a Republican, a Democrat, or by any member of either such party who claims to be a liberal, a conservative, a moderate, or any other category in the spectrum of viewpoints or leanings embraced within the membership of such party, or by a member of any other group or organization. The constitutionally protected right here under consideration is personal to him, it does not belong to any group or organization with which he may be affiliated, and it is to have his ballot effectively count as one ballot, not substantially less and not substantially more. If this right is properly safeguarded, he has no constitutionally cognizable right to complain. As is aptly said in Gray v. Sanders, 372 U.S. 368, 380, 83 S.Ct. 801, 808, 9 L.Ed.2d 821 (1963):

> "The concept of political equality in the voting booth contained in the Fifteenth Amendment extends to all phases of state elections * * * and, as previously noted, there is no indication in the Constitution that homesite or occupation affords a permissible basis for distinguishing between qualified voters within the State."

The philosophy of *Reynolds* is the protection of the rights of individuals. "Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests." 377 U.S. at 562, 84 S.Ct.

at 1382. It is well to add that votes for legislators are not cast by political interests as such, but by individuals— people. As said by the Supreme Court:

> "[N]either history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes. Considerations of area alone provide an insufficient justification for deviations from the equal-population principle. *Again, people, not land or trees or pastures, vote.*" 377 U. S. 579–580, 84 S.Ct. 1391 (Footnote omitted.) (Emphasis added.)

In support of their contention of political gerrymandering, plaintiffs offered evidence purporting to show voting histories of certain areas, this for the purpose of demonstrating that if single-member districts were used, then a certain number of candidates of one party or another would be elected. These voting histories, however, do not prove that a certain area is Republican or Democratic, or liberal, conservative, moderate, or any other type Republican or Democrat, at any given time, but instead graphically point out the evanescence of a prevailing philosophy or political belief in particular areas of a community. The only demonstrable way available to fathom the political inclinations of a certain area at any given time is at the ballot box on a given election day.

The best example of this is Dallas County. According to the plaintiffs' interpretation of voting histories, a majority of the voters of Dallas County were Republicans in 1962 but were Democrats in 1960 and 1964.[42] The dif-

---

42. Frank Crowley, a County Commissioner of Dallas County and elected as a Republican, testified in his deposition, defendants' Exhibit No. 15, that one Republican candidate for the Legislature ran at large in Dallas County in 1960, and lost; that six Republican candidates for the Legislature ran at large in Dallas County in 1962, and won; and that all Republican candidates for the Legislature running at large in Dallas County in

1964 lost. Commissioner Crowley expressed his personal preference for single-member districts for several reasons, especially for the purpose of shortening the ballot. He expressed the opinion that gerrymandering could result from the use of single members, as well as from multi-member districts, and that such gerrymandering could result in minimizing or canceling out the votes of either of the political parties. The Commissioner

ference between 1962 and 1964 was not due to a change of the apportionment statute, which was amended in 1961,[43] and it is doubtful that it was due to any substantial change in the party alignment of the voters of the County. The Court is of the opinion that the changes in party voting in 1962 and 1964 were due to vagaries in the political attitudes of the people of those areas in ways that are impossible of proof in this or any other Court. Thus, the inquiry of this Court must end when it is satisfied that the judicially-ascertainable standard of substantial equality of population in the districts has been achieved.

The comments of other Courts are enlightening. In WMCA, Inc. v. Lomenzo, 238 F.Supp. 916, at 926 (S.D.N.Y. 1965) aff'd, 382 U.S. 4, 86 S.Ct. 24, 15 L.Ed.2d 2 (U.S. Oct. 11, 1965), the Court remarked:

> "Since plaintiffs have neither argued nor proved that the alleged political gerrymandering has produced districts of unequal populations, this suit does not come within the purview of Reynolds v. Sims. It is true that the opinion in that case treated partisan gerrymandering as an evil which a state may legitimately seek to preclude. * * But Fortson v. Dorsey, supra, * * makes it clear that the Supreme Court has refrained from condemning partisan gerrymandering as unconstitutional."

A three-judge Court in Alabama observed:

> "The practice of gerrymandering for the purpose of preventing members of a political party from being elected to office is a familiar one. That type of gerrymandering may

continue to present a 'political' question with which the judicial branch of government is not equipped to deal. (Footnote omitted.)

 \* \* \* \* \* \*

" \* \* \* *Political parties are not mentioned in the Constitution.* \* \* \* " (Emphasis added.)

Sims v. Baggett, 247 F.Supp. 96, 104–105 (M.D.Ala.1965)

This Court concludes that plaintiffs' allegation of political gerrymandering does not state a claim upon which relief may be granted. WMCA, Inc. v. Lomenzo, supra. And further, the Court finds that the record contains no evidence of probative force tending to support the factual allegations which plaintiffs make in support of their claim of political gerrymandering.

### B. *Racial Gerrymandering*

Plaintiffs charge that the multi-member and flotorial districts are the result of ulterior motive and sinister design and that they are "the arbitrary and capricious result of gerrymandering for partisan advantage" and "a scheme designed to minimize or cancel out the voting strength of racial \* \* \* elements (*i. e.*, \* \* \* the Negro race)," each in violation of the Equal Protection Clause of the Fourteenth Amendment.[44] This will be referred to as the racial gerrymandering charge. Further, plaintiffs allege that, exclusive of the eleven flotorial districts, H.B. 195 creates primarily single-member districts and that this pattern varies "only in the major urban centers where Negroes live in ghetto areas of high population density, and comprise a substantial percentage of the total population." Relying upon Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), they conclude that " 'The unmistakable effect

declined to testify that designation of Dallas County as a multi-member district was the result of a scheme or of bad motives.

43. Tex.Rev.Civ.Stat.Ann. Art. 195 (Supp. 1964).

44. Robert W. Hainsworth in his amicus curiae statement asked the Court to de-

fer decision upon the question of racial discrimination in multi-member districts pending appeal of Hainsworth v. Martin, 386 S.W.2d 202 (Tex.Civ.App.1965), error ref. n. r. e. The question is now ripe for decision. The Supreme Court vacated the appeal as moot, 86 S.Ct. 256 (1965) and denied rehearing, 86 S.Ct. 532 (1966).

of these essays in geometry and geography is to despoil negro citizens' * * and to deny them their right to vote as guaranteed under the Fifteenth Amendment," which will be referred to as the Negro disenfranchisement charge.

Attacks upon an apportionment plan which allege that the Legislature harbored the sinister design of racial discrimination are familiar.[45] But as the Supreme Court said in Flemming v. Nestor, supra, where the motive of Congress was attacked in a similar manner:

"Turning, then, to the particular statutory provision before us, appellee cannot successfully contend that the language and structure of * * [the statute], or the nature of the deprivation, requires us to recognize a punitive design.

\* \* \* \* \* \*

"We observe initially that only the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground. Judicial inquiries into Congressional motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed. Moreover, the presumption of constitutionality with which this enactment, like any other, comes to us forbids us lightly to choose that reading of the statute's setting which will invalidate it over that which will save it. '[I]t is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void.' Fletcher v. Peck, 6 Cranch 87, 128, 3 L.Ed. 162." 363 U.S. at 616–617, 80 S.Ct. at 1376.

The racial gerrymandering charge stems from the dicta in Fortson v. Dorsey, supra, which observes that:

"It might well be that, designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial * * * elements of the voting population." 379 U.S. at 439, 85 S.Ct. at 501.

But plaintiffs have not demonstrated here that H.B. 195 effectively minimizes, cancels out, or even affects, the voting strength of any racial element. As a matter of fact, such a demonstration would be very difficult, if not impossible, before any election is held under the Bill. The Court has carefully reviewed the record related to this serious charge and finds as a fact that it does not contain a scintilla of probative evidence to substantiate plaintiffs' charges of racial gerrymandering. The testimony offered by plaintiffs in this area is highly conjectural and to the extent it proves anything, it tends as much to disprove as to prove the existence of such gerrymandering.

The testimony of C. B. Bunkley, an attorney from Dallas and a member of the Negro race, supports this finding of fact. Mr. Bunkley is politically experienced, having been a candidate for the Dallas City Council in 1959 and 1965. He testified that to his knowledge there had never been a successful Negro candidate for a city-wide office in Dallas, and based upon this, concluded that multi-member districts operate virtually to cancel out the voting strength, as measured by the opportunity to elect a Negro to office, of Negro elements in Dallas. He did not state explicit facts which would prove racial discrimination in the use of

---

45. E. g., the following cases involve attacks upon an apportionment scheme as being racially discriminatory: Mann v. Davis, 245 F.Supp. 241 (E.D.Va.1965), aff'd. Burnette v. Davis, 382 U.S. 42, 86 S.Ct. 181, 15 L.Ed.2d 35 (U.S. Oct. 25, (1965); Hainsworth v. Martin, 386 S.W. 2d 202 (Tex.Civ.App.1965), error ref.

n. r. e., vacated as moot 86 S.Ct. 256 (U.S. Nov. 15, 1965), petition for rehearing denied 86 S.Ct. 532 (U.S. Jan. 18, 1966); Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964); Sims v. Baggett, 247 F.Supp. 96 (M.D. Ala.1965).

multi-member districts and, when questioned, could not identify any legislation designed to discriminate against Negroes passed by the last Legislature. Nevertheless, he expressed the feeling generally that Negroes have not been heard or represented, and his preference that groups ought to be able to elect "people of like interests." Having an obvious preference for single-member districts, he stated that more than one legislative district of approximately 64,000 could be created in a predominantly Negro area in Dallas County. However, he acknowledged never having attempted to draw a redistricting plan for Dallas County. Nowhere in his testimony did he state that Negroes' votes have been numerically diluted. In essence, his objection to H.B. 195 is that the population of multi-member districts is too large, which makes it more difficult to elect a Negro to the House of Representatives.

Representative G. F. Mutscher, who served as Chairman of the Congressional-Legislative District Committee of the 59th Legislature and whose deposition was offered in evidence by plaintiffs, supra, made the following statements which are uncontradicted:

"At absolutely no time did the chair or any member of the committee ever attempt to insert—or discriminate against any racial, religious, or political group in the drafting of this bill. * * * I don't recall any racial group's contacting me concerning how the lines should be drawn in either Dallas or Tarrant County."

Plaintiffs' witness Dr. Clifton McCleskey testified that " * * * if one set out to draw single representative districts to achieve * * * the end of electing * * * negroes, [he thinks] this would be in and of itself a wrong application and approach." Since Dr. McCleskey is a professor of political science, we construe this testimony as meaning that in his opinion the federal Constitution would not permit drawing districts with the express purpose of electing members of any particular race.

Although Dr. McCleskey observed that one of the consequences of the use of multi-member districts is to submerge *any* minority elements within such a district, when read in full text it is clear he did not hold the opinion that multi-member districts were inherently unconstitutional, or that they caused H.B. 195 to be invalid. This is obvious from his use of both single-member and multi-member districts in his own PARC Plans, offered by plaintiffs as model plans for reapportionment. Dr. McCleskey also testified that one of the consequences of a single-member district plan, such as proposed by plaintiffs, would be to segregate Negroes from other voting groups and thus enhance their opportunity for election to office, but again, he did not suggest that such a plan would cause invalidity. Dr. McCleskey further testified that neither consequence should be the purpose of the Legislature. He did not purport to testify as to the intent of the Legislature and, although pressed, would not state that the Legislature intentionally used multi-member districts to submerge the votes of Negroes. In summary, Dr. McCleskey's " * * * position is that one should start with a principle for drawing boundary lines and apply that [principle], no matter what the consequence." As we view the Doctor's testimony, it was concerned with how best to reapportion, not whether or not the reapportionment of H.B. 195 resulted in racial gerrymandering.

Samuel B. Hamlett, called by plaintiffs and also discussed above, expressed the opinion by deposition that the use of multi-member districts submerged the voting strength of racial elements and made it difficult for this group to find expression through representation in any kind of member-at-large scheme. He also testified that, to his knowledge, no Negro had been elected to the State Legislature from Tarrant County since the Reconstruction period. Nowhere did he testify that the Legislature intentionally utilized multi-member districts to submerge the voting strength of Negroes or that H.B. 195 dilutes the weight of their vote numerically. He did not mention the long

history of multi-member districts in Texas, which ante-date Reconstruction,[46] and he furnished no substantiation for his opinion other than the failure of Tarrant County to elect a Negro to the Legislature in recent years.

■ No witness testified that racial considerations motivated the Legislature when it drew the district lines of H.B. 195, and the Court will not infer the existence of such a sinister motive in the action of the Legislature without clear proof thereof. No one testified that H.B. 195 dilutes the weight of the votes of Negroes as a race or as individuals in a manner different from any other group of citizens located in the same district.

Here, however, the testimony of plaintiffs' witnesses Bunkley and Hamlett argues in terms of voting strength of racial elements, which these witnesses seem to view, not as a right of equality in the weight of votes, but as a right to be represented by a person of one's own race. This is an erroneous legal premise, as shown by Dr. McCleskey's testimony and the authorities.

■ The pertinent constitutional provision for the allegation of racial gerrymandering is the Fourteenth Amendment which provides in Section 1: "* * * [N]or shall any State * * * deny to any person within its jurisdiction the equal protection of the laws." Case law adds the judicial gloss that a classifica-

tion based solely upon race, creed, color or nationality constitutes an invidious discrimination which violates the Fourteenth Amendment.[47] But just as there is no guaranteed right to have proportional representation of races upon a jury, so long as in the selection of jurors to pass upon the life, liberty or property of a man there has been no discrimination against them because of their race, creed or color, Akins v. State of Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945), there is no right to have proportional representation of races, creeds or colors in the Legislature so long as there is an equal opportunity for all to register[48] and vote in districts of substantial population equality. Reynolds v. Sims, supra; Mann v. Davis, supra.

■ Equal protection does not require formation of all single-member districts in a state's legislative apportionment scheme. Fortson v. Dorsey, supra. The use of multi-member districts is not unconstitutional on the ground that it deprives Negro citizens of a chance to elect a member of their race. Mann v. Davis, (U.S. Oct. 26, 1965).[49]

As Dr. McCleskey clearly implied in his testimony, a plan drawn to favor or satisfy the demands of a particular racial group or element would be seriously constitutionally suspect, just as it would be unlawful to draw a plan intentionally to dilute their votes. In another case involving an allegation of racial gerrymandering, Mr. Justice Douglas, in dis-

46. Commencing with the first apportionment provision in Texas in Article 3, Section 30 of the Constitution of the State of Texas of 1845, every apportionment statute in Texas history has contained multi-member districts. In addition to the statutes cited in note 20 supra, a constitutional amendment in 1869 divided the State into 30 districts and then apportioned each district one Senator and a certain number of Representatives, ranging from two to four per district. Constitution of the State of Texas, 1869, Art. 3, Secs. 39, 40, 7 Gammel 395. For example, the 21st District, typical of all of the districts, consisted of Dallas, Tarrant, and Collin Counties, and received one Senator and three Representatives.

47. Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 67–72, 21 L.Ed. 394 (1873) (Race); Strauder v. West Virginia, 100 U.S. 303, 307–308, 25 L.Ed. 664 (1880) (Race); Yick Wo v. Hopkins, 118 U.S. 356, 368–369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (Race, Color, or Nationality).

48. Denial by the State of Texas of the rights of Negroes to register and vote is not in issue here. This issue is raised in United States v. State of Texas, 252 F.Supp. 234, W.D.Tex. (1966).

49. Mann v. Davis, 245 F.Supp. 241 (E.D. Va.1965), aff'd. sub nom. Thornton v. Davis, 382 U.S. 42, 86 S.Ct. 181, 15 L.Ed.2d 35 (U.S. Oct. 26, 1965).

438

sent, analyzed the question incisively and observed:

"Racial electoral registers, like religious ones, have no place in a society that honors the Lincoln tradition—'of the people, by the people, for the people.' Here the individual is important, not his race, his creed, or his color. The principle of equality is at war with the notion that District A must be represented by a Negro, as it is with the notion that District B must be represented by a Caucasian, District C by a Jew, District D by a Catholic, and so on. * * Of course race, like religion, plays an important role in the choices which individual voters make from among various candidates. But government has no business designing electoral districts along racial or religious lines. We held * * * that courts in selecting juries need not—indeed should not—give each jury list the proportional racial complexion that the community has. If race is not a proper criterion for drawing a jury list, how can it be in designing an electoral district?" Wright v. Rockefeller, 376 U.S. 52, 66–67, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964) (Dissenting Opinion) (footnote omitted).

Thereafter, a three-judge court in Virginia, commenting upon the identical issue, answered the contention thusly:

"The concept of 'one person, one vote', we understand, neither connotes nor envisages representation

according to color. Certainly it does not demand an alignment of districts to assure success at the polls of any race. *No line may be drawn to prefer by race or color.*" Emphasis added.) Mann v. Davis, supra, 245 F.Supp. at 245.

The Supreme Court gave this language added weight, by affirming. Sims v. Baggett, 247 F.Supp. 96 (M.D.Ala.1965), which involved a charge of racial gerrymandering, was not cited in support of this charge by plaintiffs, and correctly so. We have examined that case on this point and find it clearly distinguished by its facts.[50]

Viewed in the above light, the inherent weakness in this complaint of racial gerrymandering is apparent. There is no way to determine how many recognizable races, creeds or colors exist,[51] each of which if represented by citizen members in Texas under plaintiffs' theory would have to be given a reasonable opportunity to elect from its membership, one or more Members of the Texas House of Representatives. The Legislature, or any reviewing court, would have an impossible task in attempting to protect the "voting rights" of "racial groups," construed in the sense plaintiffs urge.

To measure this position in this light, it must be borne in mind that the Legislature would likewise have to provide similarly for "creeds" and "nationalities." In attempting to use this theory as a guideline, this Court could identify more combinations of races, creeds, and nationalities present in Texas today whose

50. The facts of this case are distinguishable from the facts of Sims in the following particulars:
(1) In Sims, the Legislature "suddenly" created a multi-county, multi-member district, contrary to a long-standing history of single-county voting units, 247 F.Supp. at 109; but Texas has a long history of the use of multi-member and multi-county, multi-member districts. Note 46 supra.
(2) In Sims, the Court found as a fact that the House plan there had the *inescapable effect* of discriminating against Negroes, *ibid;* this Court finds as a fact that H.B. 195 does not have this effect.

(3) In Sims, the Court found as a fact that the discrimination there was what the Legislature intended, *id;* this Court finds as a fact that the Legislature did not intend to discriminate against Negroes.

51. See Lasker, The Evolution of Man (1961), at 194; Alexander, General Biology (1962), at 877–879; Villee, Biology (4th ed. 1964), at 564; American Academy of Political and Social Science, Religion in American Society (Nov. 1960), at 2, 125–134; Stores, Many Creeds, One Cross (1945); Landis, World Religions (1965), at 7–9.

voting rights under plaintiffs' theory are minimized by H.B. 195, than there are seats in the Texas House of Representatives. It is unlikely that plaintiffs contend that this Court should create enough districts to assure every possible "race, creed, or color or national origin" that each would be able to elect one of its own to office, but the ultimate extension of plaintiffs' logic would produce this result.

Returning to the testimony of Mr. Bunkley and Professor Hamlett to the effect that multi-member districts make the election of Negroes more difficult, which is their reason for asserting that the voting strength of Negroes is submerged, it is appropriate to point out that the prior apportionment statute which this Court held invalid discriminated harshly against the metropolitan areas, generally.

H.B. 195 increases the representation of the metropolitan areas by 16 Representatives, or 46% over the prior statute, as follows:

Harris County – from 12 to 19 Representatives
Dallas County – from 9 to 14 Representatives
Bexar County – from 7 to 10 Representatives
Tarrant County – from 7 to 8 Representatives

Although Negroes have not been elected from these metropolitan areas in recent years, which fact may be due in large part to the extreme dilutions present in these areas, undoubtedly both of these informed witnesses were aware of the history of the election of Negroes to the Texas Legislature from multi-member districts. The Court will judicially notice this history of the composition of the past membership of the Texas House of Representatives,[52] a matter of public

52.

NEGRO LEGISLATORS IN TEXAS
NUMERICAL ROSTER *

| | |
|---|---|
| CONSTITUTIONAL CONVENTION, 1868–69 | 9 delegates |
| Twelfth Legislature, 1871 | 2 Senators,<br>9 Representatives |
| Thirteenth Legislature, 1873 | 2 Senators,<br>6 Representatives |
| Fourteenth Legislature, 1874 | 1 Senator,<br>6 Representatives |
| CONSTITUTIONAL CONVENTION, 1875 | 6 delegates |
| Fifteenth Legislature, 1876 | 1 Senator<br>3 Representatives |
| Sixteenth Legislature, 1879 | 1 Senator<br>7 Representatives |
| Seventeenth Legislature, 1881 | 1 Senator<br>4 Representatives |
| Eighteenth Legislature, 1883 | 2 Representatives |
| Nineteenth Legislature, 1885 | 2 Representatives |
| Twenty-first Legislature, 1889 | 2 Representatives |
| Twenty-second Legislature, 1891 | 1 Representative |
| Twenty-third Legislature, 1893 | 1 Representative |
| Twenty-fourth Legislature, 1895 | 2 Representatives |

* Source—Brewer, Negro Legislators in Texas (1935).

record later compiled in a well-researched book on the subject. See Brewer, Negro Legislators of Texas (1935). This history reflects that Negroes have been elected to serve as State Representatives forty-five times since the Constitutional Convention of 1868–69, spanning the years from 1871 to 1895. Of the 44 who actually served, 27 were elected from multi-member districts; and of these 27, 14 were from multi-county multi-member districts. Thus, neither witness testified that a Negro cannot be elected from a multi-member district, and correctly so.[53]

Additionally, apportionment of both houses of a bicameral state legislature is relevant to the Court's consideration of this claim. Maryland Committee for Fair Representation v. Tawes, supra. Plaintiffs allege that it would be difficult to elect a Negro to the Texas House without a single-member district plan. The Senate, which also provides effective representation for its constituency, is apportioned on a single-member district basis by S.B. 547, increasing metropolitan representation by 7 Senators, or 175% over the prior statute, as follows:

Harris County — from 1 to 4 Senators
Dallas County — from 1 to 3 Senators
Bexar County — from 1 to 2 Senators
Tarrant County — from 1 to 2 Senators

The Senate plan, which divides these metropolitan areas internally into single-member districts, should give Negroes and persons similarly situated in many of these districts excellent opportunities to elect a member of their race to the Legislature.

The Court finds as facts that H.B. 195 was not intended to constitute a scheme to minimize or cancel out the voting strength of the Negro race, that it does not do so, and therefore, it does not have the effect of discriminating against the Negro race. On the other hand, the Court finds, as shown by the legislative history, that the Legislature had as its purpose in passing H.B. 195 to distribute the 150 seats of the House of Representatives into districts of contiguous and compact territory with substantially equal population "to meet the criteria of the Federal Court."

### Negro Disenfranchisement

We turn now to plaintiffs' Fifteenth Amendment charge that Negro disenfranchisement results from the use of multi-member and flotorial districts. In this connection, it is significant that the

Supreme Court has expressly held that multi-member districts are not *per se* discriminatory.

In the broad governmental sense, a franchise is a right or privilege conferred by grant from a sovereign or a government and vested in an individual or group. Typically, such a right is constitutional or statutory. As is generally understood in the United States, *the* franchise is the personal right of the qualified individual to vote. Plaintiffs charge that H.B. 195 despoils this right, in violation of Section 1 of the Fifteenth Amendment, which provides:

"The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

To support this charge, plaintiffs rely upon Gomillion v. Lightfoot, supra, which involved a change in the municipal boundaries of Tuskegee, Alabama, by the State Legislature of Alabama. Whereas, its previous shape was a square, the resultant 28-sided figure created by the legislative action eliminated from the city

---

53. Note 52 supra.

all but four or five of the 400 Negro voters, without excluding a single white voter. The Legislature's sole purpose, obvious and found as a fact by the Court, was disenfranchisement of Negro voters. from municipal elections in Tuskegee. As the Court pointed out:

"The complaint amply alleges a claim of racial discrimination. Against this claim the respondents have never suggested, either in their brief or in oral argument, any countervailing municipal function which * * * [the change] is designed to serve." 364 U.S. at 342, 81 S.Ct. at 127.

But the facts involved in *Gomillion* readily distinguish the action of the Alabama Legislature found to be invalid, from the action of the Texas Legislature evidenced. by H.B. 195. In Alabama, Negroes who previously had had the right to vote in the municipal elections of Tuskegee suddenly had that right denied by a change in the boundaries of the city. Whereas, before the change they had had the municipal franchise to vote, the change in boundaries removed this franchise. Negroes no longer could participate in a municipal election of Tuskegee, and the Court stated:

" * * * [T]he Fifteenth Amendment to the Constitution of the United States * * * forbids a State from passing any law which *deprives* a citizen of his vote because of his race." 364 U.S. at 345, 81 S.Ct. at 129.

House Bill 195 does not alter, but on the other hand continues, (1) the pattern of single-member and multi-member districts authorized and used for the first apportionment of Texas by the Constitution of 1845; or (2) the pattern of single-member, multi-member or flotorial districts specified in the first apportionment act of the Texas Legislature which was passed in 1848.[54] It is significant that this pattern did not change during the Reconstruction period. It has not since been changed.

House Bill 195 does not suddenly redefine any previous urban area boundary. Indeed, the boundaries of the multi-member districts which embrace three of the four major urban centers—Dallas, Tarrant, and Bexar Counties—are identical with those which have obtained for several decades. And the fourth, Harris County, now merely embraces three districts rather than the previous one district, for the reasons explained by Representative Mutscher in his deposition offered in evidence by the plaintiffs. The three internal divisions of Harris County follow the congressional district lines which were set up in the congressional redistricting act. These congressional district lines were not attacked as such in *Bush.* Had there been thought to be any maldistribution or disenfranchisement of Negroes involved in redistricting Harris County for congressional purposes, we believe it safe to assume that the question would have been raised in the ably prepared and presented case of *Bush.*

The reapportionment of the Texas Senate following the Court's prior action in this case has not been attacked, and we therefore assume that plaintiffs deem it to meet the constitutional standard of "one man, one vote." [55] All four of the metropolitan areas have substantially larger representation, numerically, both in the House and Senate, as a result of the reapportionment of each. Consequently, Negroes residing in the four metropolitan districts, like all other citizens of every other color, creed and nationality, have the opportunity to vote for more Representatives and Senators than before.

■ Therefore, on this charge of Negro disenfranchisement, the Court makes the same findings of fact and conclusions of law heretofore made in response to plaintiffs' charge of racial gerrymandering.

54. Note 46 supra.

55. Senate Bill 547, Acts of the 58th Legislature, Regular Session, 1965, c. 342.

*Crazy Quilt*

The plaintiffs' final challenge to H.B. 195, germane to Issue 4, is the allegation that it "contains a needless mixture of multi-member, flotorial, and single member districts, which reapportion the 150 House seats in a 'crazy quilt' manner completely lacking in rationality, and it thus unconstitutional on this ground alone." The plaintiffs look not to the opinion of the Court but to an adjective phrase contained in the concurring opinion of Mr. Justice Clark in Baker v. Carr, supra, for this theory. In 369 U.S. at 258, 82 S.Ct. at 732 he remarked: "The discrimination here does not fit any pattern—as I have said, it is but a crazy quilt." The Court finds that H.B. 195 does not constitute a "crazy quilt" scheme of apportionment and once again emphasizes that the test for validity of an apportionment statute under *Reynolds* is substantial equality of population, which H.B. 195 satisfies except for the limited aspect already indicated.

It does not appear to the Court that Mr. Justice Clark intended his concurring opinion in *Baker* to create a new standard for measuring the constitutionality of an apportionment statute. His concurrence utilizes the legal shorthand of "crazy quilt" but provides no new theory of invalidity.[56] Careful analysis of his opinion reveals that Mr. Justice Clark viewed the problem in the same way that the Court later viewed it in *Reynolds*. In analysis, whereas in *Baker* the challenged statute did not satisfy the requirements of the Constitution of the State of Tennessee, 369 U.S. at 254, 82 S.Ct. at 729, here, we have held that H.B. 195 conforms to both the policy formulated by the Texas Constitution and the legislation enacted for more than a hundred years,

under that Constitution.[57] And in further analysis, in characterizing the Tennessee statute as a crazy quilt, Mr. Justice Clark did not condemn any particular *type* of district, but instead bolstered his charge of discrimination through the use of extreme examples of *population disparity*. See 369 U.S. 253–258, 82 S.Ct. 729–732. Although he did not subscribe to the "one man, one vote" concept later implemented in Wesberry v. Sanders, 376 U.S. 1, 18, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), he did recognize in *Baker* that "[T]here must be some rational design to a State's districting," 369 U.S. at 258, 82 S.Ct. at 732, even if mathematical equality were not the standard, and concluded that "The frequency and magnitude of the [population] inequalities in the present districting admit of no policy whatever." 369 U.S. at 254, 82 S.Ct. at 729. Conceptually, Mr. Justice Clark was speaking in terms of the minor deviations allowable under *Reynolds*, but, of course, before the latter case was finally decided.

Plaintiffs argue that the combination plan of H.B. 195 is arbitrary and capricious because in certain districts a candidate for the Texas House must appeal to a larger number of people than a candidate for the United States House or a candidate for the Texas Senate, and that "historically, the framework of Texas State Government has always envisioned a system whereby one State Senator represents a larger area and a greater number of people than does one State Representative." However, such is not a fact. The Constitution of 1869, in Article 3, Sections 39 and 40, created 30 districts, each of which received one Senator and two or more Representatives.[58] Every Representative had to appeal to as many people as the Senator from his dis-

---

56. Certain language in Reynolds v. Sims does not alter this conclusion. The Court stated, " * * * [T]he existing apportionment * * * presented little more than crazy quilts completely lacking in rationality, and could be found invalid on that basis alone." 377 U.S. at 568, 84 S.Ct. at 1385. (Footnote omitted.) Without the standard of population equality which the Court had adumbrated

previously in the same paragraph, the test would have been, simply, reasonableness as judged by familiar Equal Protection standards, but because of the new standard of that case, the Court did not need to use the crazy-quilt "test."

57. See notes 20 and 46 supra and accompanying text.

58. For an example, see note 46 supra.

trict and had to run from a district exactly equal in area to the Senator's from the same district. Similar examples exist under the 1961 statutes.

Plaintiffs also challenge the use of flotorial districts under the same theory. However, inasmuch as these districts as presently constituted are invalid, the Court will not discuss them extensively here except to note their historical longevity.[59]

Further, the reapportionment statute of 1848 [60] used a combination plan similar to the plan of H.B. 195. Later statutes used combination plans,[61] and their use reflects a long-standing public policy of the State of Texas.

▮ Finally, the record does contain rational explanations for the use of these various types of districts.[62] The policy of the Texas Constitution and the weight of the Texas legislative history of apportionment justify the use of the flotorial districts, if validly constructed upon a population basis. The desire to maintain the integrity of a political subdivision such as a county is a legitimate aim for a state, so long as the resulting plan does not contain substantial population disparities. Reynolds v. Sims, supra.

▮ Additional legitimate factors considered by the Legislature reflect a rational, permissible State policy underlying the use of multi-member districts:

(1) A desire to avoid cutting county lines, which would violate Article III, Section 26 of the Texas Constitution, except where necessary to satisfy the standard of Reynolds.

(2) A desire to continue the historical use of multi-member districts in counties which were entitled to more than one Member.

(3) The difficulty in correlating city-limit lines, election precinct lines, Justice precinct lines, Commissioners' precinct lines, Senatorial District lines, and Congressional District lines—many of which may not be included partially in another.

(4) The difficulty of obtaining adequate and accurate legal descriptions of districts smaller than county size.

(5) A desire to assure adequate representation to the county as a whole to prevent impediment of the legislative process resulting from minor arguments between Representatives of various suburbs within the county limits.[63]

As noted earlier, there is no constitutional infirmity inherent in the use of either multi-member districts in which the candidates are elected on a county-wide basis, Fortson v. Dorsey, supra; or, in flotorial districts, Reynolds v. Sims, supra; or, in single-member districts, Reynolds, 377 U.S. at 577, 84 S.Ct. at 1389, or, in a combination of such districts, Reynolds, 377 U.S. at 579, 84 S.Ct. at 1390.

Senate Bill 547, which reapportions the Senate of the State of Texas, utilizes single-member districts only, so that the entire scheme of apportionment of the State of Texas comports with the permissible policy implicit in the Court's opinion in Reynolds; i. e., it utilizes single-member districts in one house and achieves flexibility in the other. Inasmuch as there is the presence of a rational state policy which commends the scheme of apportionment in Texas, and there is the absence of any significant population disparity beyond the flotorial situation, the plaintiffs' "crazy quilt"

---

59. See note 20 supra and accompanying text.

60. Red River County constituted a single-member district, Red River and Bowie Counties constituted a flotorial district, and Harris County was a multi-member district. Ch. 162, § 3, 3 Gammel 311 (1848).

61. The later statutes are the same as those enumerated in note 46 supra.

62. See p. 423 of Opinion, which refers to legislative history of H.B. 195.

63. Such policy seeks to avoid having a metropolitan area, with its inherent problems, become a bastion of minority interests. See Comment, 72 Yale L.J. 968, 1001–1002 (1963).

444

charge is not supported either in fact or in law. Reynolds v. Sims, supra.

The Ewing group of intervenors complain of the method used in H.B. 195 to allocate Representative Districts to Harris County. The Legislature did not create a single multi-member district in Harris County, but instead created three multi-member districts within the county limits, in which districts the candidates run at large. The shape of these three districts conforms to the boundaries of the Congressional Districts concurrently established for Harris County. The Legislature apportioned Harris County in this manner pursuant to the policy of H.B. 195 which limits the size of any multi-member district to fifteen Representatives.

■ One very practical purpose of this latter limitation is to avoid overtaxing the capacity of the voting machines by limiting the size of a multi-member district to a reasonable population. The presence of more than fifteen names on a ballot would require the use of two machines to accommodate all of the candidates, and this result would increase enormously the expense of a general election in Texas. The policy will apply equally to all counties which attain a population of 1,000,000 or more, so this system is not an arbitrary discrimination toward Harris County. This is not an irrational state policy by any standard; and in the absence of substantial population disparity between these districts, the system is within the protective language of *Reynolds*, 377 U.S. at 579, 84 S.Ct. at 1391.[64]

For all of the reasons previously mentioned which justify the use of multi-member districts, plus the additional practical reason of limiting the load on

the voting machines, this Court holds that House Bill 195 does not deny equal protection of the laws to these intervenors from Harris County.

*The Remedy*

Because of the inequities present in the flotorial districts, this Court must correct this particular situation. It is appropriate that the Court should delineate here the basic premises governing the remedy that it will utilize.

■ The matter of remedy is within the bosom of a court of equity, and this proceeding requires the formulation of a solution which draws its vitality and efficacy from its peculiar propriety for apportionment of the Texas House of Representatives. That the Supreme Court of the United States left the matter of remedy to the discretion of the trial court seems clear. In Reynolds v. Sims, which is the lodestar in this area, the Court did not consider " * * * the difficult question of the proper remedial devices which federal courts should utilize in state legislative apportionment cases. Remedial techniques in this new and developing area of the law will probably often differ with the circumstances of the challenged apportionment and a variety of local conditions." 377 U.S. at 585, 84 S.Ct. at 1393. (Footnote omitted.) [65] Although not ruling upon the question of remedy, the Court made the following observation:

"We feel that the District Court in this case acted in a most proper and commendable manner. It initially acted wisely in declining to stay the impending primary election in Alabama, and properly refrained from acting further until the Alabama Legislature had been given an

64. "So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature."

65. " * * * [A]ny relief accorded can be fashioned in the light of well-known principles of equity." Baker v. Carr, 369 U.S. 186, 250, 82 S.Ct. 691, 727 (1962). (Concurring opinion.) (Footnote omitted.)

opportunity to remedy the admitted discrepancies in the State's legislative apportionment scheme, while initially stating some of its views to provide guidelines for legislative action. And it correctly recognized that legislative reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." 377 U.S. at 586, 84 S.Ct. at 1394.

The Supreme Court did not set any explicit limits upon the trial court's discretion in the matter of remedy in any of the major decisions rendered with Reynolds v. Sims.[66] In both WMCA, Inc. v. Lomenzo, supra, and in Roman v. Sincock, supra, the Supreme Court remanded the case to the trial court with instructions for that court to formulate the remedy.

Thus, this Court finds no authoritative expression which limits it in fashioning the remedy which it deems appropriate in the circumstances. The customary concepts of equitable discretion will be utilized, both as to the manner and timing of relief.[67]

The Court solicited comment from the parties concerning a decree similar to the one of Toombs v. Fortson, 241 F.Supp. 65 (N.D.Ga.1965). There, the Court held that the proposed plan of apportionment of the Georgia state house of representatives, though constitutionally insufficient, would be accepted as an interim plan and the legislature would be given an opportunity to reapportion Georgia properly by May 1, 1968.

Plaintiffs strenuously oppose such a decree on two grounds:

(1) They say relief must be effective immediately; and

(2) They say H.B. 195 must fall in toto because it has no severability clause.

The Court cannot agree, for reasons which follow.

The 1961 apportionment act, originally attacked by plaintiffs and set aside by this Court, contained flotorial districts, but plaintiffs did not challenge their validity in the original complaint. At that time plaintiffs did not intimate (a) that this type of district was inherently discriminatory, (b) that the use of flotorial districts resulted in an invidiously discriminatory population disparity,[68] or (c) that the use of these districts in combination with other types of districts resulted in a "crazy quilt" scheme of apportionment. It was not until this, the third round of the struggle, that challengers urged the inherent invalidity of flotorial districts. In the case of Davis v. Mann, supra, decided after entry of the original judgment in this case, the

---

**66.** "We find it inappropriate to discuss questions relating to remedies at the present time, beyond what we said in our opinion in Reynolds." WMCA, Inc. v. Lomenzo, 377 U.S. 633, 654–655, 84 S.Ct. 1418, (1964) (Footnote omitted). To the identical effect, see Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 675, 84 S.Ct. 1429, 12 L. Ed.2d 595 (1964); Davis v. Mann, 377 U.S. 678, 692, 84 S.Ct. 1441, 12 L.Ed. 2d 609 (1964); Roman v. Sincock, 377 U.S. 695, 710, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964); and Lucas v. Forty-Fourth Gen. Assembly of State of Colo., 377 U.S. 713, 739, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964).

**67.** "In awarding or withholding immediate relief, a court is entitled to and *should consider the proximity of a forthcoming election* and the mechanics and complexities of state election laws, and *should act and rely upon general equitable principles*." Reynolds v. Sims, 377 U.S. at 585, 84 S.Ct. at 1394. (Emphasis added.)

**68.** It should be noted that Dr. Clifton Mc-Cleskey, plaintiffs' expert witness on the subject of state government, submitted exhibits with his deposition that computed deviation in the flotorial districts in the same manner as did the Committee and the Legislature, i. e., by dividing total population of the "dominant" and "appurtenant" counties by the number of Representatives assigned thereto. See Item 46, Plaintiffs' Exhibit No. 14–(1).

Supreme Court, in dicta, could easily have led the Legislature into a genuine belief that these very flotorial districts would be valid.[69]

Now, what has just been said is not intended as criticism of the motives or conduct of any of plaintiffs, particularly the Member plaintiffs who undoubtedly had good reasons for not doing so. But these facts do have bearing, indeed persuasion, upon this Court which has the duty to do equity between all parties in fashioning its remedy. Had even the possibility of the defect in the flotorial districts been pointed out to the Legislature, it could have been cured very simply by requiring all Members from these districts to run at large as in any other multi-member district.[70] Without this possible defect being pointed out, the Legislature had every reason to provide for voting in such districts as had been done in Texas without question for over 100 years.

 Concededly, reapportionment is a legislative function,[71] and " * * * primary responsibility for legislative apportionment rests with the legislature itself * * *." Maryland Committee for Fair Representation v. Tawes, 377 U.S. at 676, 84 S.Ct. at 1440. Inasmuch as this Court has directed the Legislature of the State of Texas to reexamine its plan of congressional apportionment by the end of its session in July 1967, Bush v. Martin, Civil No. 63–H–266, S.D. Tex. Jan. 5, 1965, 251 F.Supp. 484, the opportunity exists to recommit H.B. 195 to them for their careful, thoughtful and complete consideration, utilizing the full resources of the legislative process which will no doubt have been mobilized for the congressional study. This exercise of discretion upon the part of the Court to defer remedy thus rests upon (1) demonstrated Legislative willingness to enact a valid legislative apportionment law for the State of Texas, and (2) appreciation by this Court of the bedrock constitutional concept of the separation of powers which requires that when the judiciary as here is required to correct legislative action, the judiciary should not intrude on the legislative prerogatives except to the very minimum extent consistent with the imperatives of the particular situation. As Chief Judge Campbell of the Northern District of Illinois so aptly observed:

"Apportionment is traditionally and necessarily a legislative function. Notwithstanding many ill-advised comments of its detractors to the contrary this fact has been generally acknowledged by the Supreme Court. (Reynolds v. Sims, 377 U.S. 533, 586, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506; ' * * * legislative reapportionment is primarily a matter for legislative consideration and determination * * * ') The Court appropriately continued by observing ' * * * that judicial relief becomes appropriate only when a legislature fails to reapportion * * * '. The problem involved then is one of judicially remedying a malapportioned voting scheme without judicially interfering with recognized legislative functions and responsibilities.

"Ours is historically and fundamentally a triune government of coordinate but necessarily separate departments. Our Constitution and traditions, appreciating Montesquieu's concern that a separation of powers is required in order that liberty of the people might be preserved, delegated to each department of government—executive, legislative and judicial—certain functions and responsibilities. Accordingly, we are conditioned to scrupulously

---

69. 377 U.S. at 686–687, 84 S.Ct. at 1445–1446.

70. See the legislative history of H.B. 195 at 423 of the Opinion and the table in note 29 supra.

71. " * * * [T]he theme we have stressed throughout this decision * * * [is that] apportionment is essentially a legislative function." Bush v. Martin, Civil No. 63–H–266, 251 F.Supp. 484, S.D. Tex. Jan. 5, 1966, at 517.

reviewing possible invasions by one government department of the functions of still another department. The fact that a federal court and a state legislature are involved hardly warrants a digression from this fundamental principle." Germano v. Kerner, 241 F.Supp. 715, 718 (N.D. Ill.1965).

The Legislature has not had an opportunity to consider carefully or comply with this new challenge;[72] and because of its good response to the previous order of this Court, such opportunity should be given. Valid equitable considerations impel us to the conclusion that affirmative action should be deferred until August 1, 1967.

■ The question that plaintiffs raise about severability or non-severability of H.B. 195 is academic. First, H.B. 195 will not be severed if the Legislature enacts a new statute prior to August 1, 1967. Second, the intent of the Legislature will not be thwarted[73] if the Court's order should thereafter become operative, because, as the legislative history demonstrates, the Legislature clearly intended to satisfy the "one man, one vote" requirement,[74] and the decree would merely effectuate what was intended. And third, under the reasoning of plaintiffs pursuant to which they pray that this Court reapportion the entire state,[75] the Court could accomplish in two steps

the same result which plaintiffs say cannot be done in one; i. e., the Court could strike down H.B. 195 and then reapportion the State in the same manner as the Bill, except utilizing multi-county, multi-member districts in place of the flotorial districts.[76] Finally, Mann v. Davis (E.D.Va.), supra, utilizes this procedure for remedy, which provides additional precedent. Plaintiffs' contention concerning severability is therefore without merit.

The Taylor intervenors suggest that this Court order the Texas Legislative Redistricting Board to reapportion the State into single-member districts. Under the Texas Constitution, this remedy is not feasible, as the Board serves a limited function not suited to this proceeding.[77]

■ The most meritorious suggestion, viewed in the traditions of equity practice, is that of Peter O'Donnell, Chairman of the State Republican Executive Committee, who urges the appointment of a special master in chancery who could develop a plan of apportionment for the Court's approval. Although courts elsewhere have used this approach,[78] the Court believes it unnecessary and therefore inappropriate here. Additionally, while it might have been practical had it been commenced at the time this party's pleading was filed, time would not permit its use now nor

72. "* * * [I]t is a part of judicial statesmanship for this Court to refrain from stepping into this particular area until after the Legislature * * * has had a fair opportunity to correct the present abuses." Wesberry v. Vandiver, 206 F.Supp. 276, 286 (N.D.Ga.1962) (concurring opinion).

73. "'The test to determine workability after severance, and whether the remainder of the act should be upheld rests on the fact of whether or not the invalid portion is of such import that the valid part would be incomplete or would cause results not contemplated by the Legislature.' Louis K. Liggett Co. v. Lee, 109 Fla. 477, 481, 147 So. 463, 149 So. 8." Watson v. Buck, 313 U.S. 387, 396–397, 61 S.Ct. 962, 85 L.Ed. 1416 (1941).

74. Opinion at 423.

75. In their prayer, plaintiffs "* * * ask that the reapportionment scheme for the House of Representatives heretofore submitted to the Court by plaintiffs, be declared the scheme of reapportionment for said House of Representatives. * * *"

76. Note 29 supra.

77. Under the provisions of Art. 3, Sec. 28 of the Texas Constitution, the Legislative Redistricting Board assembles only if the Legislature fails to reapportion the State at its first regular session after the publication of each United States decennial census. The Board did not assemble in 1961 because the Legislature enacted an apportionment statute.

78. See, e. g., Butterworth v. Dempsey, 237 F.Supp. 302 (D.Conn.1965).

would it have done so even at the time the last briefs were received.

The decree attached to this Opinion as Appendix "E" details the plan of relief which the Court adopts. To summarize the decree briefly, it sustains H.B. 195 as valid in all respects but for the eleven flotorial districts which contain invidiously discriminatory population disparities; it approves H.B. 195 as a valid interim plan of apportionment for purposes of the 1966 elections, but it orders that if the Legislature does not rectify the unconstitutional dilution of votes which results from voting in these districts as is now provided for, by Tuesday, August 1, 1967, then until the Legislature does so rectify this unconstitutional result, these flotorial districts shall become multi-county, multi-member districts and the candidates therein shall run at large. Additionally, the decree provides that the parties respectively bear their own costs.

The above and foregoing constitutes the Court's findings of fact and conclusions of law in this case.

JOHN R. BROWN, Circuit Judge (concurring):

I concur fully in the result. And I concur fully in the opinion except for that division styled "Burden of Proof." [79] I think that, as this Court did in Bush v. Martin, S.D.Tex.1966, 251 F.Supp. 484 [C.A. No. 63–H–266, Jan. 5, 1966], we need not, and therefore should not, take any hard and fast position or even indicate our views on who has the burden, or when or under what circumstances the burden shifts or when the burden is met.

It took nearly 175 years to come to Baker v. Carr's recognition that legislative bodies—as are the Judiciary, the Executive, the Administrators—are not only under the Constitution but amenable to judicial scrutiny. See Gomillion v. Lightfoot, 5 Cir., 1959, 270 F.2d 594, 599 (dissenting opinion), rev'd, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110. I think that as this hard-fought, hard-won right begins to flower, we ought not to stunt its growth by artificial, and rigid, standards out of another day. Certainly not until the development of this new approach demonstrates that such standards are appropriate and needful.

The Court does not need, the Court does not use, them here. Rather, as the opinion so carefully emphasizes, the Court factually finds affirmatively that: (1) there is no political gerrymandering; (2) there is no racial gerrymandering; (3) there is no Fifteenth Amendment Negro disenfranchisement; (4) there is no crazy quilt; and (5) excepting flotorial districts, there is no population disparity. Conversely, as a factual matter, we find affirmatively that there are acceptable rational explanations afforded in this record for the action of the Texas Legislature in this apportionment and in the use of the various types of districts employed (see text accompanying notes 62–64, supra, and items (1) through (5) in text at note 63, supra, 252 F.Supp. 443). The efforts to cast this into three mutually exclusive areas—(1) de minimis at one extreme, No. (3) per se at the other, with the second being (2) "the area of the big middle"—really solves nothing. In none is judicial inquiry avoided. In each there is a judicial

---

79. There may be a slight difference, perhaps mostly in emphasis, perhaps nothing more than semantics, with respect to one other matter. The opinion, citing Sincock v. Roman, D.Del., 1964, 233 F.Supp. 615, 619, states that "in reviewing the validity of an apportionment statute, it is not within the reach of the Court's inquiry to determine which is the better or best, wiser or wisest, of two or more apportionment proposals. * * * The concern * * * of this Court, is not that which might have been done, but

that which was done." 252 F.Supp. at 431. Granted that it is not for the Judiciary to select the "good," the "better," or the "best," I think that, as this Court held in Bush v. Martin, 1966, S.D.Tex., 251 F.Supp. 484 at 509 [C.A. No. 63–H–266, Jan. 5, 1966], in determining whether the enacted plan achieves substantial numerical equality or equality as nearly as is practicable, the process necessarily is a comparative one so that other plans, either offered or available, are of great significance.

determination that this much is not too much, this much is way too much, or this much does or does not pass muster. In determining this, the substantive standard is clear: (a) substantial numerical equality—numerical equality as nearly as is practicable—and (b) deviations from numerical equality are permitted if they have a rational basis in legitimate state interests. Both (a) and (b) are a part of the constitutional obligation of the state. And judicial determination of whether this constitutional imperative has been met ought not to go off on, or be thwarted or frustrated by, the slippery change of reviewing standards as the particular disparity goes up or down the scale.

Moreover, these are not just ordinary cases if, indeed, any serious constitutional issue may be so characterized. This, as was the parallel congressional case, is one in which this very Court struck down the predecessor statute. Instead of the Court using its acknowledged equity power to formulate and impose a court-directed plan, it followed, with evident wisdom, the process once again applied of leaving it first to the Legislature. But the Court retained jurisdiction as it does again. The legislation under attack was enacted in response to that conditional judicial order. That order contemplated that the product of the legislature would be tested to determine whether there was any need to exercise the reserved power to enter a subsequent equity decree and to determine whether the product was constitutionally acceptable. Legislation brought into being under those circumstances to meet a specific challenge in a specific case bears little resemblance to the situation in which after routine enactment, private or public parties attack the constitutional validity of a new bill. I do not mean to say that such responsive legislation is suspect. This, like talking in terms of "presumptions" (see note 8 and accompanying text), just affords another stumbling block to the simple, though profound and

awesome, judicial inquiry in this new and rapidly developing area.

The constitutional imperative is plain. The substantive standard is clear. Why not take the record and lay it against those standards and then see whether it does or does not measure up? The one thing always obvious in any reapportionment bill is the numerical result. The problem necessarily then relates to a qualitative evaluation of factors which do or do not justify the deviation. If there are rational significant state policies, then it is the state which knows this better than any other party. To say that individual plaintiffs seeing widespread numerical disparity have to undertake to prove the negative of any possible conceivable rational basis in a state of 254 counties and a population of nearly 10 million is to insulate state activity from meaningful judicial inquiry. Worse, in the name of a procedural standard to expedite the trial of cases, it is to commit the Judiciary to an incongruous process in which, to scrutinize the needle which must exist to overcome the numerical deviation, the attackers must first stack and then unstack the hay. The prospect becomes all the more irrational when, as in Texas and in our two cases (state and congressional), the parties and the Court are put to the awkward task of reconstructing a legislative history from reports of political pundits, news reporters' accounts of heated exchanges, or the like.

If, as some long thought, this is a "political thicket," then I think that the law must work out both the substantive and procedural rules as the nature of the serious problem requires. We ought, therefore, to postpone as long as possible any hard choice. What the burden of proof rule should be, I do not know. I think it should be hammered out from experience. Because the opinion on this score forecloses this opportunity for pragmatic experimentation and would commit the Court to a rigid policy born of quite different controversies, I must, with deference, register this difference.

APPENDIX "A"

The original plaintiffs were the following:

(1) William W. Kilgarlin, Chairman of the Democratic Executive Committee of Harris County, Texas;

(2) Robert C. Eckhardt, State Representative from the old 22nd Representative District in Harris County, Texas;

(3) Don Kennard, State Senator from the old 10th Senatorial District in Tarrant County, Texas;

(4) Franklin Spears, State Senator from the old 26th Senatorial District in Bexar County, Texas; and

(5) Jake Johnson State Representative from the old 68th Representative District in Bexar County, Texas.

All allege that they are duly qualified voters in Texas and taxpayers. They bring suit in their own behalf and for all voters similarly situated. The cause has both lost and gained plaintiffs since rendition of summary judgment by this Court on January 11, 1965. The following have dropped out, all State Representatives: Myra Banfield, Ben Barnes, John E. Blaine, Jack Crain, David Crews, Wayne Gibbens, Forrest A. Harding, George T. Hinson, James L. Slider, and Bill Walker. Certain plaintiffs have been added, who will "broaden the base of the class, and * * * make it more representative." They are:

(1) Josh Gates, State Representative from the old 30th Representative District and a resident of the newly-created Representative District 20F (a flotorial district) in Fort Bend County, Texas;

(2) Dan Weiser, Secretary of the Democratic Executive Committee of Dallas County, Texas, and a resident of the old 51st Representative District and the newly-created 33rd Representative District of Dallas County;

(3) Malcom McGregor, a resident of the old 74th Representative District and the newly-created 67th Representative District of El Paso County, Texas;

(4) Edgar Berlin, a resident of the old 9th Representative District and the newly-created 9th Representative District of Jefferson County, Texas; and

(5) Francis L. Williams, a resident of the old 22nd Representative District and the newly-created 24th Representative District of Harris County, Texas, who is a Negro.

Plaintiffs sue in their own behalf and for all voters similarly situated. Plaintiffs, and thus the parties who align with them, contend that House Bill 195 is unconstitutional on five major grounds:

(1) That it submerges population as the controlling consideration in the apportionment of seats in the Legislature, especially in the eleven flotorial districts wherein the right to vote allegedly is diluted substantially;

(2) That exclusive of the flotorial districts, it deviates arbitrarily and unreasonably from the population of the ideal or average district;

(3) That it accomplishes partisan gerrymandering through the use of multi-member districts, allegedly designed to cancel out or minimize the voting strength of racial or political elements—specifically, Republicans, liberal Democrats, and Negroes;

(4) That through the use of multi-member districts in major urban centers, it deprives Negroes of their right to vote, in violation of the Fifteenth Amendment; and

(5) That it "contains a needless mixture of multi-member, flotorial, and single member districts, which reapportion the 150 House seats in a 'crazy quilt' manner completely lacking in rationality * * *."

With the exception of ground number four, all of the alleged violations, if proven, would constitute denials of equal protection of the laws under the Fourteenth Amendment. Plaintiffs pray the Court to declare that H.B. 195 is uncon-

stitutional on one or all of the above grounds and to reapportion the House of Representatives pursuant to a single-member-district plan which they submitted to the Court.

Numerous intervenors were permitted to file interventions and participate in the hearing. Those referred to as the Taylor intervenors consist of the following:

(1) Guthrie Taylor, a resident of Bertram, Burnet County, Texas, the old 65th Representative District and the newly-created District 40F;

(2) James S. Miles, a resident of Taylor, Williamson County, Texas, the old 54th Representative District and the newly-created District 38F;

(3) John Wells, a resident of Collin County, Texas, the old 50th Representative District and the newly-created District 32F; and

(4) Job O. Booth, Jr., a resident of Bexar County, Texas, the old 68th Representative District and the newly-created 57th District.

They sue in behalf of all voters similarly situated. They align themselves with the plaintiffs and adopt their pleadings, asserting that Texas should be redistricted into 150 single-member districts of equal population to assure them equal representation and their votes equal weight. They pray the Court to declare H.B. 195 unconstitutional and to adopt their proposed single-member-district plan of apportionment, either by direct court order or by an order requiring the Legislative Redistricting Board of Texas to so apportion the State. See Art. 3, § 28 of the Texas Constitution.

Other intervenors referred to as the Ewing intervenors consist of the following:

(1) John Kirby Ewing;

(2) R. F. Spurlock; and

(3) Harry E. Lindsey.

All allege that they are residents of Harris County, Texas. They sue in behalf of all persons similarly situated.

The Ewing intervenors, representing themselves to be qualified voters of Harris County, Texas, allege that H.B. 195 is unconstitutional because it treats Harris County differently from all other counties in the State by placing ths 19 representatives allocated to Harris County in three separate multi-member districts within the county limits rather than in one multi-member district consisting of Harris County, thus violating the equal protection clause of the Fourteenth Amendment. These intervenors, claiming to represent all of the voters in Harris County as a class, pray that the Court declare House Bill 195 unconstitutional *only* with regard to those provisions dividing Harris County into three multi-member districts. They pray that the Court enter its order requiring representatives from Harris County to be elected at large, county-wide. Their prayer is in effect that Harris County be constituted one multi-member district rather than three.

Certain named defendants are the following state and party officials:

(1) John Connally, Governor of the State of Texas;

(2) Crawford Martin, Secretary of State of the State of Texas;

(3) Waggoner Carr, Attorney General of the State of Texas;

(4) Preston Smith, Lieutenant Governor of the State of Texas;

(5) Ben Barnes, Speaker of the House of Representatives of the State of Texas;

(6) Robert S. Calvert, Comptroller of Public Accounts of the State of Texas; and

(7) Jerry Sadler, Commissioner of the General Land Office of the State of Texas; and

(8) Peter O'Donnell, Jr., Chairman, Texas State Republican Executive Committee.

Although served with copies of the pleadings and briefs through counsel of

record, the following did not participate in this proceeding: William M. Elliott; Robert E. Turrentine, Jr.; Dorsey B. Hardeman; George Moffett; Louis Crump; Ralph M. Hall; J. P. Word; Grady Hazlewood; Galloway Calhoun, Jr.; Tom Creighton; Frank Owen, III; H. J. Blanchard; Walter L. Buenger; Billy Hodges; Milton D. Richardson; Julio Guzman; Eugene Locke; Will D. Davis; R. H. Lee; Anna Bennett; W. M. Adams; Ann Lyle; William A. Schmidt; and Velma Sherman.

In answer, defendants refute plaintiffs' contentions in detail and question the accuracy of their examples. Defendants assert that plaintiffs "are only able to represent their own point of view, which is a minority point of view, not only in their own county but in their legislative district and in the State of Texas as a whole." Defendants pray that the Court declare H.B. 195 constitutional in all respects and award them their costs.

A named defendant is Peter O'Donnell, Jr., Chairman of the Texas State Republican Executive Committee, who filed an answer admitting all of the allegations of the plaintiffs' First Amended Complaint and praying that this Court take jurisdiction to determine the rights and duties of the parties herein. Although styled as a defendant herein, in his brief this defendant aligns himself as a plaintiff and adopts the brief filed by plaintiffs. Therefore, when the term "defendants" is used in the opinion, it will not include the Chairman of the State Republican Executive Committee unless so stated.

The Court permitted the filing of statements by one group and one individual, appearing herein as amicus curiae. The first amicus statement is that of a group of thirty-two legislators headed by F. DeWitt Hale of Corpus Christi, Texas. They assert that they are not parties nor attorneys of record in this cause but are interested in the outcome only as duly-elected public officials of the State of Texas because it will affect the policies of government of the State of Texas. The gist of their statement is that the majority of the Legislature has no quarrel with the decisions of the Supreme Court of the United States which require apportionment on the basis of population and which hold that factors such as historical political boundaries, communities of interest, and other rational state policies may constitutionally be considered in drawing district lines, so long as the resulting plan does not violate the basic requirement that representation be based upon population. Further, as members of the Legislature, they state that they have dedicated their efforts to achieve this result in the State of Texas. Finally, they assert that they represent a cross-section of thinking both in the Legislature and in the State of Texas, and suggest that it would be erroneous for the Court to conclude that the plaintiff-legislators, Senators Eckhardt and Kennard and Representatives Johnson and Gates, reflect the thinking of that body because " * * * [M]ost members are opposed to the position taken by plaintiffs."

The second amicus statement is that of Robert W. Hainsworth, a lawyer admitted to practice before this Court and a member of the Negro race, who requested this Court to defer decision upon the issue of racial discrimination through the use of multi-member districts, pending his appeal to the Supreme Court of the United States of Hainsworth v. Martin, 386 S.W.2d 202 (Tex.Civ.App.1965), error ref. n. r. e., which raises the identical issue under the old statute. The Court vacated the appeal as moot, 86 S.Ct. 256 (U.S. Oct. 25, 1965), and denied a petition for rehearing, 86 S.Ct. 532 (U.S. Jan. 18, 1966).

APPENDIX "B"

Subsequent to the hearing of this cause, the Court invited the parties to brief further the question of the relief or remedy which should be ordered by the Court with regard to the situation in the flotorial districts, in the event H.B. 195 should be held invalid as to such districts. The Court suggested that a decree similar to the one in Toombs v. Fort-

son, 241 F.Supp. 65 (N.D.Ga.1965) might be appropriate, in such event.

The parties replied in a variety of ways. Plaintiffs filed an extensive brief which reargued the entire case before concluding with their view of the proper remedy. They contend (1) that the Court lacks authority to stay redress for any length of time, declining discussion of postponement of remedy beyond August 1, 1967 as being too remote; (2) that this Court has no alternative but to enjoin the 1966 elections under H.B. 195 and grant relief effective almost immediately; (3) that the Court has no duty to resubmit the matter to the Legislature sitting in regular session, because that body has had its one allowable chance to apportion Texas in a constitutional manner and has failed; and (4) that the Court lacks the power to sever H.B. 195 and to strike down the flotorial districts only. Plaintiffs assert that the Court, either itself initially or after reference to a master, must promulgate a complete, new plan of apportionment for the 1966 elections. Finally, they suggest that the Court should "announce certain general standards, guidelines, and criteria to provide a basis for review of future apportionment acts."

Defendant O'Donnell, although having aligned himself with plaintiffs, suggests similar remedies but in somewhat different order. First, he suggests appointment of a special master in chancery to formulate a plan subject to the Court's approval. Alternatively, if no master be appointed, he asks that the Court (1) hold H.B. 195 invalid, (2) enjoin all elections thereunder, and (3) return the ultimate responsibility for the adoption of a constitutional plan of apportionment to defendants again, forcing the convention of a special session of the Legislature.

Defendants state their order of preference, in the event the Court should reach the question of remedies, to be as follows: (1) that the Court should recognize H.B. 195 as a valid interim procedure, but order the Legislature to reapportion the State properly subsequent to the 1970 census; or (2) that the Court should

recognize H.B. 195 as a valid interim procedure, but order the legislators from the flotorial districts to run at large therein if the Legislature does not correct the discrimination in these districts by August 1, 1967; or (3) that the Court should recognize H.B. 195 as a valid interim procedure, but hold it invalid as of August 1, 1967 if not amended by such date; or (4) that the Court should require the legislators from the flotorial districts to be elected at large therein for the 1966 elections and subsequent elections. They assert that the Court would be in error to enjoin the holding of elections under H.B. 195. Defendants answer plaintiffs' contentions by asserting (1) that the Court does not lack authority to stay redress; (2) that the Court would err in enjoining the 1966 elections under H.B. 195; (3) that the Legislature has had no opportunity to correct this particular deficiency, if it be a deficiency; and (4) that the Court obviously has the power to sever.

The Hale amicus curiae group expressed an order of preference for possible remedies. First, they desire (1) that the Court approve H.B. 195 as a valid interim measure until completion of the 1970 Federal Census, subsequent to which the Legislature would validly reapportion the State as required by law; or (2) that the Court outline the standards under the Fourteenth Amendment which it deems necessary for the Legislature to satisfy; and (3) that the Court retain continuing jurisdiction of the cause. Second, they ask if the Court should not proceed as first suggested, that the Court uphold H.B. 195 as a valid interim measure until the next regular session of the Legislature, commencing January 1, 1967, and afford that body the opportunity to correct the deficiencies prior to August 1, 1967, failing which, the Court should order that the candidates from the dominant and appurtenant counties all run at large from the counties comprising the respective flotorial districts, thus making multi-member districts out of the flotorial districts. If the Court should deem immediate relief to be proper, they pre-

fer the solution of running candidates at large within the flotorial districts. These legislators express their overriding concern to be that H.B. 195 be maintained insofar as possible, even if certain portions thereof are invalid.

## APPENDIX "C"

### Districts Not Having Constituent Counties in a Flotorial District

| District Number | District Total | Number of Representatives Per District | Population Per Representative | Percentage of Deviation from Ideal District of 63,864 | |
|---|---|---|---|---|---|
| 1 | 59,971 | 1 | 59,971 | — | 6.09 |
| 2 | 60,906 | 1 | 60,906 | — | 4.62 |
| 3 | 62,464 | 1 | 62,464 | — | 2.19 |
| 4 | 63,549 | 1 | 63,549 | — | 0.49 |
| 5 | 67,367 | 1 | 67,367 | + | 5.48 |
| 6 | 68,813 | 1 | 68,813 | + | 7.75 |
| 7 | 67,767 | 1 | 67,767 | + | 6.11 |
| 8 | 60,357 | 1 | 60,357 | — | 5.49 |
| 9* | 245,659 | 4 | 61,415 | — | 3.83 |
| 10 | 60,877 | 1 | 60,877 | — | 4.67 |
| 11 | 63,889 | 1 | 63,889 | + | 0.03 |
| 12 | 70,808 | 1 | 70,808 | + | 10.87 |
| 13 | 69,436 | 1 | 69,436 | + | 8.72 |
| 16 | 61,282 | 1 | 61,282 | — | 4.04 |
| 17 | 57,551 | 1 | 57,551 | — | 9.88 |
| 18 | 57,604 | 1 | 57,604 | — | 9.80 |
| 21* | 140,364 | 2 | 70,182 | + | 9.89 |
| 22* | 417,283 | 7 | 59,612 | — | 6.65 |
| 23* | 408,409 | 6 | 68,068 | + | 6.58 |
| 24* | 417,396 | 6 | 69,566 | + | 8.93 |
| 25 | 66,272 | 1 | 66,272 | + | 3.77 |
| 26 | 67,361 | 1 | 67,361 | + | 5.47 |
| 27 | 59,683 | 1 | 59,683 | — | 6.54 |
| 28 | 55,772 | 1 | 55,772 | — | 12.67 |
| 29 | 65,119 | 1 | 65,119 | + | 1.96 |
| 30 | 63,896 | 1 | 63,896 | + | 0.05 |
| 33* | 951,527 | 14 | 67,966 | + | 6.42 |
| 34 | 67,045 | 1 | 67,045 | + | 4.98 |
| 41 | 66,706 | 1 | 66,706 | + | 4.45 |
| 42 | 71,301 | 1 | 71,301 | + | 11.64 |
| 43 | 63,067 | 1 | 63,067 | — | 1.24 |
| 44 | 66,961 | 1 | 66,961 | + | 4.85 |
| 49* | 180,904 | 3 | 60,301 | — | 5.58 |
| 50 | 70,105 | 1 | 70,105 | + | 9.77 |
| 51 | 69,992 | 1 | 69,992 | + | 9.59 |
| 52* | 538,495 | 8 | 67,312 | + | 5.39 |
| 53 | 61,571 | 1 | 61,571 | — | 3.59 |
| 54 | 56,594 | 1 | 56,594 | — | 11.38 |
| 55 | 64,815 | 1 | 64,815 | + | 1.49 |
| 56 | 56,750 | 1 | 56,750 | — | 11.13 |
| 57* | 687,151 | 10 | 68,715 | + | 7.59 |

* Denotes multi-member districts

## APPENDIX "C"

Districts Not Having Constituent
Counties in a Flotorial District

| District Number | District Total | Number of Representatives Per District | Population Per Representative | Percentage of Deviation from Ideal District of 63,864 | |
|---|---|---|---|---|---|
| 58 | 70,845 | 1 | 70,845 | + | 10.93 |
| 59 | 69,184 | 1 | 69,184 | + | 8.33 |
| 60 | 68,621 | 1 | 68,621 | + | 7.45 |
| 63 | 60,846 | 1 | 60,846 | — | 4.72 |
| 64 | 64,067 | 1 | 64,067 | + | 0.31 |
| 65 | 61,112 | 1 | 61,112 | — | 4.30 |
| 66 | 70,874 | 1 | 70,874 | + | 10.97 |
| 67* | 314,070 | 5 | 62,814 | — | 1.64 |
| 70 | 67,717 | 1 | 67,717 | + | 6.03 |
| 71 | 64,630 | 1 | 64,630 | + | 1.19 |
| 72 | 70,357 | 1 | 70,357 | + | 10.16 |
| 73 | 60,884 | 1 | 60,884 | — | 4.67 |
| 74 | 55,055 | 1 | 55,055 | — | 13.79 |
| 75 | 62,165 | 1 | 62,165 | — | 2.66 |
| 78 | 55,517 | 1 | 55,517 | — | 13.07 |
| 79 | 59,774 | 1 | 59,774 | — | 6.40 |
| 80* | 115,580 | 2 | 57,790 | — | 9.51 |
| 81 | 54,385 | 1 | 54,385 | — | 14.84 |
| 82 | 60,508 | 1 | 60,508 | — | 5.25 |
| 83 | 66,478 | 1 | 66,478 | + | 4.09 |
| 84 | 56,528 | 1 | 56,528 | — | 11.48 |
| 85* | 123,528 | 2 | 61,764 | — | 3.28 |
| 86 | 56,793 | 1 | 57,793 | — | 9.50 |

\* Denotes multi-member districts

| | |
|---|---|
| Average Overrepresentation | – 6.70% |
| Average Underrepresentation | – 6.01% |
| Average Range | 12.7% |

---

## APPENDIX "D"

Waggoner Carr

Attorney General of Texas

Supreme Court Building

Austin 11, Texas

May 19, 1965

---

Honorable Ben Barnes

Speaker of the House

Austin, Texas

Dear Mr. Speaker:

As a result of the analyzing and briefing of Section 26, Article III of the Texas Constitution of 1876 and the recent decisions of the U. S. Supreme Court on the subject of state reapportionment, this office has reached the following legal conclusions.

1. Whenever a single county has sufficient population to be entitled to more

than one representative, all of the representatives to which it is entitled *shall be apportioned* to that county.

2. Multi-representative counties may be apportioned so that the representatives can run at-large within the county or from individual districts within the county *or,* a combination of any of these methods.

3. If a single county does not have sufficient population to entitle it to one representative, such county shall be joined with one or more contiguous counties until the proper population ratio is achieved. *The above cited provision of the Texas Constitution requires that counties be kept intact and their boundaries not be violated.*

4. Should the keeping of counties intact result in a violation of the Supreme Court "one man, one vote" rule, then the county lines must be violated *but only* to the extent necessary to carry out the mandate of the Supreme Court. In all other instances, county lines must remain intact and multi-county districts or flotorial districts be formed by the joining of complete and contiguous counties.

The above legal conclusions have been set out as clearly and concisely as possible. These conclusions have been reached by a thorough analysis of the Texas constitutional provisions as well as recent federal court decisions. Our research has also thoroughly developed the legislative history and legislative interpretation of the legislative sessions immediately prior to and immediately subsequent to the adoption of the constitutional provisions involved.

Yours very truly,

Waggoner Carr

WC:ld

## APPENDIX "E"

### IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION

WILLIAM W. KILGARLIN, ET AL.,
Plaintiffs,

VS.

CRAWFORD MARTIN, Secretary of State of the State of Texas, ET AL.,
Defendants.

CIVIL ACTION
NO. 63–H–390

### DECREE

This cause having come on for trial at which all parties, including intervenors and amicus curiae, were present by counsel; and the Court having heard the evidence and having considered the pleadings, evidence, and arguments of counsel; and the Court being of the view that a Decree should be entered granting relief to the plaintiffs only to the extent hereinafter specified, for the reasons set forth in the Court's Opinion filed this day which constitutes also the Court's findings of fact and conclusions of law under Federal Rules of Civil Procedure 52(a);

It is therefore ORDERED, ADJUDGED, and DECREED by the Court:

FIRST: The Court hereby declares that the present apportionment of Representative Districts for the State of Texas as set forth in House Bill 195, 59th Legislature, Vernon's Texas Sess. Law

Service ch. 351 at 753 (1965) [Tex.Rev. Civ.Stat.Ann. Art. 195a (Supp. 1965)], is constitutional and therefore valid EXCEPT for Districts identified therein as 15F, 20F, 32F, 36F, 38F, 40F, 46F, 48F, 62F, 69F, and 77F, which Districts as presently constituted are unconstitutional and therefore invalid.

SECOND: In conducting any election for the nomination or election of any Member of the House of Representatives of the State of Texas, the named defendants, individually and in their respective official Representative capacities, and their respective agents, officers and employees, are hereby enjoined from enforcing, applying or following said House Bill 195, (a) as to invalid Districts 15F, 20F, 32F, 36F, 38F, 40F, 46F, 48F, 62F, 69F, and 77F; and (b) as to Districts 14, 19, 31, 35, 37, 39, 45, 47, 61, 68, and 76, which, though valid, are hereinafter recomposed with the invalid Districts to create new, valid, multi-member Districts.

THIRD: Pending enactment by the State of Texas of a new apportionment act in substitution for or amendment of said House Bill 195 which complies with the requirements of the Constitution of the United States and other applicable law, the counties embraced in Representative Districts numbered 14, 15F, 19, 20F, 31, 32F, 35, 36F, 37, 38F, 39, 40F, 45, 46F, 47, 48F, 61, 62F, 68, 69F, 76, and 77F in House Bill 195 are hereby recomposed in multi-member districts and each such District shall bear the number and shall be entitled to elect the number of Representatives indicated for it, as follows:

14 Smith, Rusk
 Place 1
 Place 2

19 Brazoria, Fort Bend
 Place 1
 Place 2

31 Grayson, Collin and Rockwall
 Place 1
 Place 2

35 McLennan, Coryell
 Place 1
 Place 2
 Place 3

37 Bell, Williamson
 Place 1
 Place 2

39 Travis, Burnet
 Place 1
 Place 2
 Place 3
 Place 4

45 Nueces, Kleberg
 Place 1
 Place 2
 Place 3
 Place 4

47 Cameron, Brooks, Kenedy, Willacy
 Place 1
 Place 2
 Place 3

61 Taylor, Haskell, Jones
 Place 1
 Place 2

68 Ector, Loving, Reeves and Winkler
 Place 1
 Place 2

76 Lubbock, Crosby
 Place 1
 Place 2
 Place 3

FOURTH: Representative Districts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 16, 17, 18, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 33, 34, 41, 42, 43, 44, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 63, 64, 65, 66, 67, 70, 71, 72, 73, 74, 75, 78, 79, 80, 81, 82, 83, 84, 85, and 86 of House Bill 195 are not changed to any extent and such Districts together with Districts 14, 19, 31, 35, 37, 39, 45, 47, 61, 68 and 76 as herein composed shall constitute the Representative Districts of the State of Texas. All other provisions of House Bill 195 except those enjoined in paragraph SECOND above shall remain in full force and effect.

FIFTH: Paragraphs SECOND, THIRD, and FOURTH of this order shall not become effective until 12 noon the first day of August, 1967, in order to enable the Texas Legislature during its next regular session or any intervening special session, to reconsider said House Bill 195 and to enact substitute legislation.

SIXTH: The parties shall bear their own costs.

SEVENTH: The Court retains jurisdiction of this complaint for such other and further orders as may be required.